**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**16-69**


**STATE IN THE INTEREST OF M.C. & A.C.**


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 27214
HONORABLE W. MITCHELL REDD, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John E. Conery, and David Kent Savoie, Judges.


**AFFIRMED.**

Larry E. Pichon
Attorney at Law
330 Alamo Street, Suite G
Lake Charles, Louisiana  70601
(337) 439-3073
COUNSEL FOR APPELLANT:
     E. C. (Mother)

Thomas W. Sanders, Jr.
State of Louisiana, Department of Children & Family Services
1919 Kirkman Street
Lake Charles, Louisiana  70601
(337) 491-2067
COUNSEL FOR APPELLEE:
     State of Louisiana, Department of Children & Family Services

Bethany Blackson
Calcasieu Parish District Attorney's Office
901 Lakeshore Drive
Lake Charles, Louisiana  70601
(337) 437-3400
COUNSEL FOR APPELLEE:
     State of Louisiana

Ann McSpadden
Attorney at Law
One Lakeshore Drive, Suite 1585
Lake Charles, Louisiana  70629
(337) 491-2461
COUNSEL FOR APPELLEE:
     M.C. (Child)
     A.C. (Child)

Michael K. Stratton
Calcasieu Parish Public Defender's Office
1032 Ryan Street
Lake Charles, Louisiana 70601
COUNSEL FOR APPELLEE:
     C.K. (Father)

**CONERY, Judge.**

E.C.[1] appeals the decision of the trial court terminating her parental rights to her minor children M.C. and A.C. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On October 21, 2013, the State of Louisiana, Department of Children and Family Services (DCFS) received a report that the two older minor children of E.C., K.B., born September 13, 2008, and J.B. born July 24, 2009, had been left unattended in a filthy home and without food. The DCFS investigated and confirmed that the older minor children, then approximately five years and four years old, were home alone. In addition, E.C. is the mother of M.C., born February 1, 2012, and A.C. born April 16, 2013, who at the time were approximately twenty-one months and six months old respectively. C.K. is the father of M.C. and A.C.

On October 21, 2013, the DCFS worker observed E.C.'s residence and found feces smeared on the carpet throughout the apartment, with dirty diapers, food, trash, and clothing strewn on the floor. The worker also documented a bottle of Amoxicillin on the kitchen floor. The apartment contained an adequate supply of baby food, but no food for the older children. E.C. was subsequently arrested on two counts of criminal abandonment.

On October 21, 2013, an oral instanter order was issued placing the children in the temporary custody of the DCFS. On October 24, 2013, a written instanter order with supporting affidavit was filed and signed by the trial court. The

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in the proceeding.

affidavit contained the information concerning the condition of E.C.'s apartment, as well as the details of the circumstances surrounding her failure to supervise the older children, K.B. and J.B. On October 25, 2013, a continued custody hearing was held, which resulted in an oral judgment, followed by a formal judgment signed November 12, 2013, which maintained custody of M.C. and A.C with the DCFS, and awarded custody of K.B. and J.B. to their father T.B., who resides in Mississippi.[2]

A case plan was developed for E.C. on November 20, 2013. The case plan reflects that M.C. and A.C. were placed in the care of their great-aunt, V.T., in Lake Charles, Louisiana. The placement was in close proximity to the parents, E.C. and C.K., which allowed for convenience in the visitation schedule. E.C.'s case plan provided for visitation with M.C. and A.C. twice monthly at the home of V.T. The goal for M.C. and A.C. was reunification and a concurrent goal of adoption.

A case review hearing was held on December 4, 2013, with a judgment signed on January 10, 2013, which found that based on the original October 24, 2013 affidavit and the November 20, 2013 case plan, it was in the best interest of M.C. and A.C. to remain in the custody of the DCFS and in the care of their great-aunt, V.T.

On December 20, 2013, the trial court held an adjudication hearing. Based on the stipulation of E.C., both M.C. and A.C. were adjudicated children in need of care. An amended adjudication order designating M.C. and A.C. as children in need of care was signed by the trial court on January 21, 2014. The order provided that E.C. was to "cooperate with the department and to comply with all the

---

[2]Although the original orders issued in this matter reference the two older children K.B. and J.B., only the termination of E.C.'s parental rights as to M.C. and A.C. are before this court on appeal.

2

requirements of the case plan dated November 20, 2013." Failure to do so could result in a petition to terminate E.C.'s parental rights to both M.C. and A.C.

A case review hearing was held on March 10, 2014, with a judgment signed on March 19, 2014. The trial court ordered that, based on the November 20, 2013 case plan, which was made a part of the order of the trial court, and the February 27, 2014 report from the DCFS, M.C. and A.C. were to remain in the custody of the DCFS and in the care of V.T.

On April 23, 2014, DCFS filed an addendum to the prior court report which stated, "The agency received information that E.C. had hit M.C. during a visit. The agency has suspended future home visitations in the caretaker's home. The visits with the children will now take place at the DCFS office and will be supervised."

The case plan review hearing held on April 23, 2014, indicated that although E.C. had apparently found employment, she still did not have stable housing. She had not maintained monthly contact with the agency worker, who had tried on numerous occasions but had been unsuccessful in contacting E.C. E.C. had undergone a mental health assessment on November 7, 2013, and was diagnosed with an "Unspecified Adjustment Disorder" for which individual therapy and medication were recommended. The case plan goal remained reunification and the concurrent goal of adoption.

At the case review hearing on July 15, 2014, the DCFS report indicated that the children remained in their placement with V.T. in Lake Charles, Louisiana, and that V.T. had completed her MAPP certification in order to adopt M.C. and A.C. in the event E.C. and C.K. did not complete their case plans. The report further stated, "The children's placement is going well, they have adapted to the home

3

environment and have bonded and adjusted well to V.T. and her family. The children are happy, health [sic], and thriving. The work [sic] has not received any safety or risk concerns in the caretaker's home." An additional case review hearing was held on November 17, 2014, with no change in the case plan for M.C. and A.C.

On January 15, 2015, the state petitioned to have the goal of the case plan changed to adoption and for the termination of the parental rights of E.C. and C.K. A case review hearing was held on April 10, 2015, and over objection of counsel for E.C., the goal of the case plan was changed to adoption. The birth certificates of M.C. and A.C. were placed into evidence. E.C. informed the trial court that she was now living in Beaumont, Texas. A termination of parental rights hearing was set for May 14, 2015.

At the termination of parental rights hearing on May 14, 2015, E.C. confirmed that she moved to Texas in February 2014 for mental health reasons. E.C. also testified that she worked at the Isle of Capri Casino from December 2013 to July 2014, when she quit because she was tired of making the trip from Beaumont, Texas to Lake Charles, Louisiana. E.C. testified that she was presently living in Section 8 housing under her sister's name. E.C. also testified that she had contacted the Texas DCFS and law enforcement and unsuccessfully tried to regain custody of M.C. and A.C. from her aunt V.T. while the children were visiting family in Texas. The termination of parental rights hearing was continued to June 26, 2015.

On June 26, 2015, all parties agreed to continue the hearing to September 25, 2015, with an alternative date of October 19, 2015, due to a problem pertaining to mental health providers and their lack of attendance and records. Counsel for E.C.

4

informed the trial court that E.C. was pregnant and due October 30, 2015. E.C. stated that the pregnancy was high risk and that her doctor's appointments were scheduled "three or four times a week." The trial court instructed E.C. to keep her counsel apprised of her condition and any travel restrictions imposed by her physicians, which would have to be documented and submitted to the trial court.

The termination of parental rights hearing went forward on September 25, 2015. At that time M.C. and A.C. had been in the custody of the DCFS for twenty-three months. During E.C.'s testimony, she did not deny hitting M.C. in April 2014. E.C.'s actions resulted in her visits with M.C. and A.C. moving from the caretaker's home to the DCFS offices where they were conducted under supervision.

During the period after April 22, 2014, and up until December 14, 2014, E.C. confirmed that she had visited M.C. and A.C. twice in September 2014 and once on December 14, 2014, despite having an opportunity to visit the minor children thirteen times in the sixth month period. After the petition was filed on January 15, 2015, in May 2015, the visitation periods were reduced to once a month. E.C. did not visit with the minor children once during the period from January 15, 2015 to the final hearing held on September 25, 2015.

When questioned about any support or contributions to M.C. and A.C., E.C. testified that she provided a birthday cake for A.C. on her first birthday, April 16, 2014, and bought some diapers and wipes during the same time period. When questioned if she had provided any further support for M.C. and A.C while they were in the care V.T. at the behest of DCFS, M.C. replied:

> I mean, not necessarily. Everything that I've bought – and I
> have bought things for my kids – I kept them with me, like diaper

bags, clothes, shoes, sheets. I have bowls beyond bowls I went bought. Everything I've kept with me.

At the end of the day why should I give it to my aunt when I have high hopes that my kids will come home. I might as well save it here instead of giving it to her.

During the hearing on September 25, 2015, the DCFS moved to dismiss the La.Ch.Code art. 1015(5) component of the claims against E.C., failure to comply with her case plan, and maintained the termination proceeding on the basis of La.Ch.Code arts. 1015(4)(b) and 1015(4)(c).[3] All claims listed above for termination of parental rights remained against the father C.K.

The case was taken under advisement with post-trial briefs due October 13, 2015. The trial court rendered its written reasons and judgment on October 22, 2015, terminating the parental rights of E.C. on the basis that she had failed to contribute to the support of M.C. or A.C. and failed to maintain significant contact with the minor children. The trial court further found that termination of E.C.'s parental rights was in the best interest of both M.C. and A.C. The trial court found the requisite intent by E.C. to permanently avoid her parental responsibility, thus

---

[3] Louisiana Children's Code Article 1015(4) provides:

Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

freeing M.C. and A.C. for adoption. A timely appeal of the trial court's ruling terminating E.C.'s parental rights is now before this court.

The trial court found that the father, C.K., did not attend any of the proceedings for M.C. and A.C. and that the State presented sufficient evidence that he failed to comply with any part of his case plan, despite having a curator ad hoc appointed to represent him. The trial court further found that C.K. "abandoned his children as defined in Ch.Code art. 1015(4)(b) and (c), as there were no contributions or contact and no evidence that the father had any interest in these children whatsoever." C.K. has not appealed the trial court's judgment terminating his parental rights to M.C. and A.C., which is now a final judgment as to him.

## ASSIGNMENT OF ERROR

E.C. asserts one assignment of error on appeal, "The trial court erred in finding the termination of parental rights granted as the evidence was not clear and convincing. The evidence did not support an [sic] termination of parental rights to M.C. & A.C."

## LAW AND DISCUSSION

*Standard of Review*

The standard of review applicable to a termination of parental rights proceeding is well settled and was stated in *State in the Interest of J.K.G.*, 11-908, p. 5 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 14, "A trial court's findings on whether or not parental rights should be terminated are subject to the manifest error standard of review." In a case involving the involuntary termination of parental rights, there are two separate private interests involved: those of the parents and those of the child. *See State ex rel D.L.R.*, 08-1541 (La. 12/12/08), 998 So.2d 681.

A parent has a natural and fundamental liberty interest in the continuing companionship, care, custody, and management of their children's lives which warrants great deference. *See Id.* In opposition to the parent's interest is the child's interest "in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care." *State ex rel. J.M.*, 02-2089, p. 8 (La. 1/28/03), 837 So.2d 1247, 1252. In termination proceedings, the interest of the parent must be balanced with the interest of the child, and "courts of this state have consistently found the interest of the child to be paramount over that of the parent." *Id.*

"The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." La.Ch.Code art. 1035(A). The supreme court has stated:

> [T]hat great care and caution must be exercised in these proceedings because the permanent termination of the legal relationship existing between children and their biological parents is one of the most severe and drastic actions the State can take against its citizens. *State in the Interest of G.J.L. and M.L.*, 791 So.2d at 85; *State in the Interest of J.A.*, 752 So.2d at 811. Parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, which warrants great deference and vigilant protection under the law. *Id.* Thus, we recognize that the potential loss to parents is grievous, "perhaps more so than the loss of personal freedom caused by incarceration." *Id.* Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully. *Id.*

*State ex rel. J.M.*, 837 So.2d at 1252-53.

Thus, the DCFS is required to establish two factors in seeking an involuntary termination of parental rights: (1) one of the eight statutory grounds for the termination of parental rights under La.Ch.Code art. 1015, by clear and convincing

evidence; and (2) that termination of parental rights is in the best interest of the child. *See State ex rel. D.L.R.*, 998 So.2d at 681.

The trial court ruled in favor of the DCFS, finding clear and convincing evidence to support the termination of E.C.'s parental rights under the provisions of both La.Ch.Code arts. 1015(4)(b) and 1015(4)(c).

Louisiana Children's Code Articles 1015(4)(b) and 1015(4)(c) provide for termination of parental rights due to:

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
>     . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

### *Louisiana Children's Code Article 1015(4)*

The trial court found that the "by otherwise leaving him under circumstances" portion of La.Ch.Code art. 1015(4) was "broad enough to encompass the actions of a parent when removal, and therefore placement, has been involuntary." In support of this proposition, the trial court cited, *State ex rel. A.T.W.*, 09-2274, p. 6 (La.App. 1 Cir. 3/26/10) (unpublished opinion), which stated:

> However, proof of abandonment under article 1015(4)(b) does not require the child to be voluntarily left; abandonment may also be proven by "leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by ... fail[ing] to provide significant contributions to the child's care and support for any period of six consecutive months."

***Louisiana Children's Code Article 1015(4)(b)***

The trial court found that there was no evidence in the record to support the proposition that E.C. made "significant contributions to the [children's] care for any period between October 2013 and the filing of the petition in January 2015." Testimony given by E.C. at trial confirmed that she was actively working at the Isle of Capri Casino as a cage cashier from December 2013 to July 2014. E.C. testified she moved to Texas in February 2014 for mental health reasons. In July 2014, E.C. resigned from her employment at the Isle of Capri Casino, when she tired of making the trip from Beaumont, Texas to Lake Charles, Louisiana. E.C. also testified that she had been employed at the Holiday Inn Express in Beaumont since May 12, 2015.

Although there was no provision in the case plan requiring E.C. to pay a monetary contribution for the care of her two children, the record is clear that based on E.C.'s work record presented to her case worker, she was capable at some point during the period that the case plan was in place, from December 4, 2013 to the hearing on September 25, 2015, to provide some monetary support for her children. E.C. testified, as stated above, that she had purchased clothing, shoes, and many items that could have contributed to the support of M.C. and A.C. However, she further testified she saw no reason to give them to V.T., as she was saving them for when she regained custody of the two minor children.

Considering the lack of contact E.C. had with M.C. and A.C., who were twenty-one months and six months respectively when they entered into the DCFS custody on October 13, 2013, coupled with the passing of twenty-three months without contact at the time of her testimony on September 25, 2015, it is difficult to believe that E.C. would have any idea of the sizes or needs of her now four and

and three-year-old children. This conclusion is supported by the testimony of E.C. on the issue of visitation and "significant contact," as discussed below. In the case of *State ex rel. A.L.D.*, 09-820, p. 11 (La.App. 3 Cir. 11/4/09), 21 So.3d 1109, 1116, a panel of this court stated:

> We recognize that, as a general rule, a parent cannot avoid providing financial support simply because she has not been ordered to do so in a case plan. *See State in re B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. Still, without some proof that C.T.D. was able to provide financial support to A.L.D. and was unwilling to do so, La.Ch.Code art. 1015(4)(b) cannot be used as a basis for termination of parental rights *See State ex rel A.T.*, 06-501 (La.7/6/06), 936 So.2d 79.

The record in this case is clear that E.C. had the means to provide at least some financial support to M.C. and A.C., as she was employed at least for a portion of the time they were in DCFS custody. Further, her testimony about the purchase of some items that would have been beneficial to her young children and her refusal to give the items to V.T., her aunt and the DCFS appointed caretaker, demonstrate that, although she had the means to contribute to the support of M.C. and A.C., she was unwilling to do so.

The record reflects that E.C. did attend the first birthday party of A.C. on April 16, 2014, and provided a cake, some gifts, diapers, and wipes. This court has held in more than one case that "sporadic gift giving does not amount to significant support." *In the Interest of T.M.S.*, 08-810, p. 6 (La.App. 3 Cir. 11/5/08), 999 So.2d 21, 26.

For the forgoing reasons, we find no manifest error in the trial court's determination that the DCFS met its burden of proof under La.Ch.Code art. 1015(4)(b) that E.C. failed to contribute to the support of her children while they were in the custody of the DCFS.

*Louisiana Children's Code Article 1015(4)(c)*

The trial court found that, pursuant to La.Ch.Code art. 1015(4)(c), E.C. had "no significant contact" with M.C. and A.C. "for a period of more than six months." The initial case plan called for visitation at the caretaker's home twice monthly, beginning on Friday, November 15, 2013. Initially, E.C. maintained contact with M.C and A.C. and participated in the visitation schedule, despite having moved to Texas in February 2014, some four months after her children came into the DCFS custody. E.C. also testified that she made unscheduled visits to V.T.'s house, while working at the casino in Lake Charles, Louisiana.

However, in reference to an April 2014 visit by E.C. in V.T.'s home, the DCFS worker sent a letter to the trial court, which stated, "**Visitations:** The agency received information that E.C. had hit M.C. during a visit. The agency has suspended future home visitations in the caretaker's home. The visits with the children will now take place at the DCFS office and will be supervised." In E.C.'s testimony at the termination of parental rights hearing on September 25, 2015, she did not deny the allegation that she hit M.C. during the April 2014 visit.

As a result of E.C.'s actions, beginning April 22, 2014, E.C.'s visits with M.C. and A.C. were moved from the caretaker's home to the DCFS offices where they were conducted under supervision. During the period after April 22, 2014, and up until December 14, 2014, E.C. confirmed at the hearing that she had visited M.C. and A.C. twice in September 2014 and once on December 14, 2014. Documentation in the record demonstrates that the DCFS sent correspondence to E.C. via certified mail, "advising of the visitation at the DCFS office every other Friday and requesting the mother to notify DCFS on the Thursday before to confirm she would be present."

Additionally, the DCFS worker called E.C. on the Thursday before her Friday June 13, 2014 visitation and was advised that E.C. would not attend. Despite the efforts of the DCFS, E.C. missed all of the scheduled visits from April 2014 until September 5, 2014. She did visit M.C. and A.C. on September 18, 2014, but she then missed the four scheduled visits in October and November 2014. Her last visit with M.C. and A.C. was on December 14, 2014.

After the petition for termination of parental rights was filed on January 15, 2015, in May 2015, the trial court reduced E.C.'s visitation from two times a month to once a month. However, both the initial testimony of E.C. and the record indicated that E.C. did not visit M.C. and A.C. from December 14, 2014 until the final hearing on September 25, 2015.

E.C. testified that it was in her best interest to move to Texas in February 2014, despite having a job in Lake Charles, Louisiana where her children were in the custody of a family member. E.C. initially testified that she had unreliable transportation and was unable to make the trip from Beaumont to Lake Charles to visit with M.C. and A.C. However, she further testified that, in connection with her compliance with her case plan, she made a number of trips to the DCFS offices in Lake Charles, Louisiana to drop off paper work to her case worker during this same time period, but due to time constraints was unable to see her children. E.C. also testified that she was pregnant with what had been classified as a high risk pregnancy. This required constant medical attention and a doctor's permission to travel, which also restricted her ability to visit with M.C. and A.C.

During the hearing on September 25, 2015, the DCFS dismissed via oral motion all the grounds for termination of parental rights against E.C. except La.Ch.Code arts. 1015(4)(b) and 1015(4)(c). More specifically, the DCFS

13

dismissed its claim that E.C. failed to complete her case plan pursuant to La.Ch.Code art. 1015(5). After the dismissal, E.C.'s testimony radically altered in connection with her visitation with M.C. and A.C.

E.C. testified, despite having previously confirmed that she had no contact with M.C. and A.C. from December 14, 2014 to September 25, 2015, that she had been present at a birthday party in Texas for A.C. on her second birthday on April 16, 2015. E.C.'s testimony was discredited by both her aunt, V.T., who is the children's caretaker, and her sister, R.C.

V.T. testified that both the children were at their daycare center in Lake Charles, Louisiana on A.C.'s birthday and that strict rules prevented E.C. from any contact with A.C. at the center. V.T. also testified that April 16, 2015, was a scheduled visitation date for E.C. V.T. contacted the DCFS offices to see if E.C. had come to the scheduled visitation and was told by the case worker that E.C. had not shown up. V.T. testified, "she could have at least shown up for her daughter's birthday."

R.C. also testified in connection with the claimed visitation with M.C. and A.C. in Texas on A.C.'s birthday. E.C. claimed that R.C. could confirm her testimony about the visitation in Texas on April 16, 2015. However, when R.C. was questioned about the visitation, her testimony was that the April 16, 2015 visitation with M.C. and A.C. took place at the DCFS offices, as scheduled in Lake Charles, Louisiana.

Counsel for E.C. argued to the trial court at the termination of parental rights hearing, and also in post-trial briefing, that La.Ch.Code art. 1015(4)(c) requires that, prior to the filing of the petition, there be no contact with the minor children for *six consecutive months*. The trial court found "that there was no significant

14

contact between the mother and her children for a period of more than six months." This period is from April 16, 2014 to December 14, 2014. E.C. did visit with her children on September 5 and September 18, 2014, and then again on December 14, 2014, which is more than six months, but not six consecutive months. The trial court found that these sporadic "visits" did not amount to significant contact.

The record is clear that E.C. had an opportunity to visit M.C. and A.C approximately thirteen times in any six month period, and in the approximately eight month period from April 2014 to December, 2014 E.C. visited only three times. Further, E.C. had not taken the opportunity to see her children from December 14, 2014, to the time of the final parental termination hearing on September 25, 2015, which is over nine months. The DCFS urges that this level of visitation does not demonstrate E.C.'s desire to maintain the significant contact necessary to avoid the conclusion that E.C. intended to permanently avoid her parental responsibility.

DCFS cites in support the *Louisiana Children's Code Handbook*, which states:

> Pertinently, it is observed "[p]aragraph (4)(c) elevates the emotional support of a child to the level required for financial support." "Parallel to Paragraph 4(b) the failure of significant, personal contact…completes the required showing of justification for termination." Note, the requirement is "significant contact… not any contact, not zero contact, not some contact…" significant contact. Just as La.Ch.Code art. 1015(4)(b) contemplates "significant contributions to the child's care and support" and the court is called on to ascertain what are "significant contributions," La.Ch.Code art. 1015 (4)(c) contemplates what is "significant contact." This is a fact based inquiry and is case specific.

Lucy S. McGough and Kerry Triche, *Louisiana Children's Code Handbook*, p. 531 (2015)

The trial court ultimately found that, although the mother was working some

aspects of her case plan:

> [T]he fact that she went months without having any contact with her young children is difficult to reconcile with any argument that she did not have the intent to permanently avoid parental responsibility. Specifically, that intent is found and based on the lack of contact more so than the lack of contributions given the portions of the case plan which were completed by the mother.

We find, based on the foregoing, that the trial court's ruling "that there was no significant contact between the mother and her children for a period of more than six months[,]" is supported by the evidence. Considering the ages of the two children and the approximately twenty-three months they have been in the DCFS's custody, contrasted with the three visits made by E.C. from April 16, 2014 to December 14, 2014, and no visitation between the filing of the petition on January 15, 2015, and the final hearing on September 25, 2015, we agree that there was no "significant contact" as contemplated by La.Ch.Code art. 1015(4)(c). Therefore, for the foregoing reasons, we find that specific intent by E.C. "to permanently avoid parental responsibility[,]" pursuant to La.Ch.Code art. 1015(4)(c) has been met.

Pursuant to *State ex rel. A.L.D.*, 21 So.3d at 1109, the DCFS's burden under La.Ch.Code art. 1015(4)(b) has also been met. E.C. testified that she was employed and, thus, would have the resources to contribute financially in some small way to the support of M.C. and A.C. Further, E.C.'s testimony confirmed that, although she had purchased a large number of items for her children, she was unwilling to give those items to M.C. and A.C. while they were in the custody of V.T. Therefore, for the foregoing reasons, we find that specific intent by E.C. "to permanently avoid parental responsibility" and furnish financial support to her children  pursuant to La.Ch.Code art. 1015(4)(b) has also been met.

### Best Interest of the Children

The second portion of the termination of parental rights analysis, once one of the statutory grounds is satisfied, requires the trial court to determine whether termination is in the best interest of the children. *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So.2d 918.

The trial court found that, "given the age of the minor children and the fact that the mother has essentially severed her relationship with them by failing to exercise the limited visitation rights she had, the court finds that the termination of her parental rights is, in fact, in the best interest of the children."

The documentation in the record reflects that both M.C. and A.C. have found a secure and loving home with V.T. and her family. V.T. has completed all the necessary training and paperwork in order to adopt both children. The record indicates that the children are thriving in their new environment. These children were removed from E.C.'s custody at approximately age twenty-one months and six months. They have spent approximately two and one-half years at the home of V.T., which makes them now slightly over four years and three years old, respectively.

In termination proceedings, the fundamental interest of the parents must be balanced with the interest of the child, and "courts of this state have consistently found the interest of the child to be paramount over that of the parent." *State ex rel. J.M.*, 827 So.2d at 1252. In this case, both M.C. and A.C. have the paramount right to continue to remain in the stable and loving environment of V.T., with the security and permanency their adoption will provide them.

We find that the trial court did not commit manifest error in its determination that it was in the best interest of both M.C. and A.C. to terminate the

parental rights of E.C. and free both children for adoption by their long time caregiver and great-aunt V.T.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED.**