# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-209


## STATE IN THE INTEREST OF B.W., C.D. & C.D.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. JU 6203
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*


## D. KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and D. Kent Savoie, Judges.



**AFFIRMED.**

**Diane E. Cote**
**Attorney at Law**
**825 Kaliste Saloom Road**
**Brandywine III, Room 150**
**Lafayette, LA 70508**
**(337) 262-5913**
**COUNSEL FOR OTHER APPELLEE:**
     **State of La., Department of Children & Fam. Services**

**Chantel Conrad**
**Acadiana Legal Services**
**1020 Surray St.**
**Lafayette, LA 70501**
**(337) 237-4320**
**COUNSEL FOR OTHER APPELLEES:**
     **B.W.**
     **C.D.**
     **C.D.**

**Lucy Melancon**
**15th Judicial Public Defender's Office**
**P. O. Box 252**
**Crowley, LA 70527**
**(337) 889-5669**
**COUNSEL FOR APPELLANT:**
     **T.W.**

**SAVOIE, Judge.**

T.W.[1] appeals the decision of the trial court terminating her parental rights to her minor children, B.W., C.D., and C.D. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On March 20, 2014, the State of Louisiana, Department of Children and Family Services (DCFS) received a report indicating that T.W., the biological mother of B.W., born September 22, 2005, C.D., born November 11, 2007, and C.D., born July 25, 2012, was incarcerated on the charge of Armed Robbery. Her bond was set at $100,000. It was further reported that the children's father, R.D., was also incarcerated for Simple Battery of the Infirm. The children were residing with their maternal grandmother, T.R., and maternal aunt, B.W.

Because T.W. lived with T.R. and her sister, the children primarily resided with them as well. However, immediately prior to DCFS's involvement, C.D. and C.D. began residing with their paternal grandparents, B.P. and W.P. T.R. and the aunt admitted to using a methamphetamine more commonly known as crystal meth. The aunt also admitted to illegal use of the drug suboxine. Due to suffering from a previous stroke, T.R. was on multiple prescription medications. T.R. and the aunt both agreed to submit to a urinalysis screening. The aunt tested positive for Amphetamines and Methamphetamines. T.R.'s urine was unable to be tested after she admitted to pouring water in the specimen cup to dilute the results. There were allegations that B.P. and W.P. were also using the illegal drugs cocaine and marijuana.

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in the proceeding.

The DCFS case worker observed that the home of T.R. and the aunt had minimal food, no refrigerator and no stove. The minor child, B.W., could not recall the last time that she had eaten. At the time of the report, both C.D. and C.D. had lice, scabies and ringworms. The two school aged children, B.W. and C.D., had not attended school in over a year. B.W. reported that she taught herself math by looking at books and counting on her fingers.

On March 24, 2014, an instanter order, along with the supporting affidavit of Bridget LeDoux, investigator with DCFS, was filed and signed by the trial court, placing the children in the temporary custody of DCFS. On May 12, 2014, this case came for hearing wherein the trial court took evidence and, thereafter, DCFS requested that the case be adjudicated as a Child In Need of Care (CINC) case. DCFS further requested that it have continued custody with the placement to remain the same. DCFS's requests were ordered by the court.

This matter came for review on August 25, 2014, February 11, 2015, May 20, 2015, and August 5, 2015. A case plan was developed for B.W., C.D. and C.D. B.W. and the elder C.D. were placed in the home of E.G., a certified foster home, in New Iberia, LA. The younger C.D. was placed in the certified foster home of B.B., also in New Iberia, LA. Visitation was scheduled for T.W. with the children every other Wednesday from 1:30 p.m. to 2:30 p.m. at the Acadia Parish DCFS office in Crowley, LA. In an August 12, 2014 report to the trial court, T.W. was reported to have visited her children according to the visitation schedule since her release from incarceration. R.D. had not visited the children since he was released from his incarceration. T.W. informed DCFS that she did not want her children placed with any of her or R.D.'s relatives. The goal for B.W., C.D., and C.D. was reunification with a concurrent goal of adoption.

At the February 11, 2015 review hearing, the goal was changed from re-unification to adoption. The court found that there was a lack of parental progress in the case plan which prevented the children from being reunited with their parents. Judgment was signed February 15, 2015.

On June 12, 2015, a Petition for Termination of Parental Rights and Certification for Adoption was filed by DCFS. It alleged that the minor children B.W., C.D., and C.D., had been in the custody of DCFS since March 20, 2014 because of neglect due to dependency on drugs in their home, physical abuse of the children, and lack of adequate shelter and food. The petition requested that the parental rights of T.W. and R.D. be terminated based on their failure to comply with the case plan and based on the same behavior that led to the children's removal being present. A termination of parental rights hearing was set for September 16, 2015.

A case review hearing was held August 5, 2015. At that hearing, both T.W. and R.D. entered general denials in response to the allegations in the Petition for Termination of Parental Rights. On September 16, 2015, the trial was continued to October 28, 2015, and a transport order was signed by the trial court, ordering the Acadia Parish Correctional Center to transport R.D. to the Crowley District Courthouse on October 28, 2015 for the termination of parental rights hearing.

T.W. was not present at the termination of parental rights hearing on October 28, 2015. Her attorney stated that, while T.W. was present earlier in the day, at some point she left, even though her attorney advised her that the trial would go forward that day. R.D. did attend the hearing.

Keashia Benoit, a child welfare specialist, was called as the first witness. She worked on the case from March 2014 until December 2014. Part of T.W.'s

case plan was to secure stable housing, however, Ms. Benoit testified that she failed in this regard. From March 2014 until May 2014, T.W. was incarcerated. After she was released, she would not let Ms. Benoit know where she was living with the exception of two occasions. Ms. Benoit was able to observe a home on the outskirts of Crowley, LA. Ms. Benoit testified that the home did not have room for the children because she had a roommate, someone who had also had their parental rights terminated. The second place Ms. Benoit was able to visit was within the city limits of Crowley, LA, however, T.W. never allowed Ms. Benoit into that home for observation. The rest of the time that Ms. Benoit worked on the case, T.W. did not seem to have a permanent residence and moved around a lot. T.W. did not want to give Ms. Benoit information about with whom she was staying.

T.W. also had a mental health component to her case plan. She was referred to Crowley Mental Health Center, but she never made an appointment. Crowley Mental Health Center was also the place that T.W. would have sought help for her substance abuse problem – another component of her case plan. She did not follow-up on this referral.

According to the case plan, T.W.'s parental contribution was seventy-five dollars (twenty-five dollars per child) per month. During the time that Keashia Benoit worked on the case, T.W. never contributed monetarily to the children's welfare. She never provided Ms. Benoit with proof of legal income.

T.W. submitted to a drug screen once during this period, and the result was negative. She was also referred for parenting classes as part of her case plan. They were to be in-home classes, however, because Ms. Benoit never knew where T.W. was living, she was unable to set up the parenting classes. Ms. Benoit mailed

4

T.W. a letter regarding January parenting classes. Ms. Benoit stopped working on the case in December and did not know if T.W. followed through with the classes.

T.W. did show up for her visits with the children. She rarely missed a visit, and she provided snacks and toys.

Ms. Benoit further testified that the youngest child, C.D., was placed in the foster home of L.T., who is willing to adopt him. The two older children, B.W. and C.D., were placed in the foster home of E.G. DCFS was in the process of finding a certified adoptive home for them.

While they were in E.G's home, B.W. and C.D. began disclosing things about previously being touched when they were in the custody of their parents. Certain behavior also raised red flags. Because of this, Ms. Benoit referred them for counseling.

Kimberly Blair, a child welfare specialist, also testified at the hearing. Ms. Blair took over the case in December 2014 as Ms. Benoit was leaving. She was still on the case at the time of trial. T.W. did provide Ms. Blair with an address where she resided. Ms. Blair was offered access to that home in February 2015. She determined that it was inadequate as stable housing because it was not furnished, it was cold, and there were clothes thrown all around the floor. It was uncertain whether T.W. was even a legal occupant of the home. In March 2015, T.W. was evicted from the home, whereupon she moved into a hotel. In April, T.W. moved again, but she was soon forced to move from that house as well. Ms. Blair also stated that a collateral source informed her that there was marijuana and pill usage in the home, and there were men in and out of the home with guns and bullets. T.W. next moved in with her boyfriend's mother. It was a two-bedroom home; she and her boyfriend lived in one bedroom, and his mother lived in the

other bedroom. At some point, T.W. moved out of this residence and into another hotel, but, she later moved back into the home of her boyfriend's mother.

T.W. never provided Ms. Blair any proof that she had a mental health evaluation. She paid one payment of fifteen dollars towards her parental contribution for the children. Since Ms. Blair has been on the case, T.W. has only missed four visits with her children. Regarding the drug screens administered to T.W. during Ms. Blair's tenure, she refused to have a hair screening done once, which DCFS counts as a positive result. All of T.W.'s urine screening came back negative.

Based on the evidence heard at the termination of parental rights hearing, the trial court terminated the parental rights of T.W. and R.D. T.W. appeals the judgment.

## DISCUSSION

*I. Standard of Review*

The standard of review applicable to a termination of parental rights case is set forth in *State in Interest of M.C.*, 16-69, pp. 7-8 (La.App. 3 Cir. 6/1/16), 194 So.3d 1235, 1240-41 (Citations omitted), which states:

> A trial court's findings on whether or not parental rights should be terminated are subject to the manifest error standard of review. In a case involving the involuntary termination of parental rights, there are two separate private interests involved: those of the parents and those of the child. A parent has a natural and fundamental liberty interest in the continuing companionship, care, custody, and management of their children's lives which warrants great deference. In opposition to the parent's interest is the child's interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In termination proceedings, the interest of the parent must be balanced with the interest of the child, and courts of this state have consistently found the interest of the child to be paramount over that of the parent.

6

Louisiana Children's Code Article 1035(A) requires that "[t]he petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." In a termination of parental rights case, DCFS must establish two factors: (1) one of the grounds listed in La.Ch.Code art. 1015 by clear and convincing evidence; and (2) that the termination of parental rights is in the children's best interest. *State in Interest of M.C.*, 194 So.3d 1235.

The trial court found that DCFS "met its burden of proof by clear and convincing evidence under Louisiana Children's Code Article 1015(4) and 1015(5),"[2] supporting the termination of T.W.'s parental rights.

## II. *Louisiana Children's Code Article 1015*

Louisiana Children's Code Article 1015 sets forth the grounds for terminating parental rights. It states in pertinent part:

> (4)    Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> (a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

---

[2] Louisiana Children's Code Article 1015 was amended, effective August 1, 2016, thereby changing the number of former Article 1015(4) to 1015(5) and former Article 1015(5) to 1015(6). The former article is cited in this opinion for consistency with the trial court.

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In the present case, the trial court found that:

[G]reater than one year ha[d] elapsed since the children were removed from the parents' custody; that said parents have failed to provide significant contribution to the children's care and support for any six month period; that said parents have failed to maintain significant contact with the children by not visiting with them or communicating with for a period of six months; that said parents have failed to substantially comply with their respective case plans including but not limited to failing to complete substance abuse treatment, failing to comply with mental health treatment, failing to obtain and maintain adequate and stable housing, failing to visit with the child as scheduled, failing to maintain consistent contact with the agency, and lack of substantial improvement in redressing the problems preventing reunification; that there is no reasonable expectation of significant improvement in said parents' condition or conduct in the near future; and, that the termination of parental rights is in the best interest of the minor children.

Louisiana Children's Code Article 1036 states that:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

It is clear from the evidence that T.W. was not compliant with her case plan. Based on the testimony of Ms. Benoit and Ms. Blair, T.W. rarely had stable and secure housing, at times living in a hotel. T.W. moved around a lot and was evasive in her whereabouts with DCFS. On the rare occasion that DCFS was able to visit T.W., she would block entry or it was determined that the housing was unsuitable for the three minor children.

Additionally, T.W. failed to provide parental contributions to her children. Her case plan set her financial contribution at seventy-five dollars per month. During the entirety of the children's custody with DCFS, T.W. contributed fifteen dollars for their care. There was no proof that T.W. had secured employment, because she never provided Ms. Blair or Ms. Benoit with proof of legal income.

9

T.W. never attended the required parenting classes or had a mental health evaluation as required by her case plan. While T.W. consistently visited with her children during the appointed visitation schedule, the evidence is clear that T.W. did not take any steps toward improving her situation, which is the purpose of the case plan. It is telling that T.W. did not deem the termination of parental rights hearing important enough to attend.

Based on the foregoing, we find that the trial court did not commit manifest error in finding that DCFS met its burden of proof under La.Ch.Code art. 1015(4) and 1015(5).

*III. Best Interest of the Children*

The second factor in determining whether to terminate T.W.'s parental rights is whether the termination is in the best of the children. *State in Interest of M.C.*, 194 So.3d 1235. The trial court found that termination was in the best interest of the children.

The record reflects that the children have been placed in loving and secure homes. The two older children, B.W. and C.D., have been in the same home since the beginning of their custody with DCFS. The younger C.D. has been in DCFS custody since he was twenty months old and is thriving. His foster family is willing to adopt him.

When weighing the rights of the parent against the rights of the children, "courts of this state have consistently found the interest of the child to be paramount over that of the parent." *Id.* at 1241. As such, we find that the trial court did not commit manifest error in determining that termination of parental rights was in the best interest of the children.

**DECREE**

The judgment of the trial court is affirmed.  All costs are assessed to T.W.

**AFFIRMED.**