# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-155

**STATE IN THE INTEREST OF**

**A. S.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. J-2020-056
HONORABLE E. DAVID DESHOTELS, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## D. KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Sharon Darville Wilson, Judges.

**AFFIRMED.**

**John Erwin Demoruelle**
**Attorney at Law**
**217 West Sixth Avenue**
**Oberlin, Louisiana 70655**
**(337) 639-2220**
**COUNSEL FOR APPELLANT:**
    **C.S. (Mother)**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 6547**
**Lake Charles, Louisiana 70606-6547**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
    **C.S. (Mother)**

**Oliver "Jackson" Schrumpf**
**Schrumpf & Schrumpf**
**3801 Maplewood Drive**
**Sulphur, Louisiana 70663**
**(337) 625-9077**
**COUNSEL FOR APPELLEE:**
    **Curtis Spears**
    **Gayla Spears**

**James David Miguez**
**Acadiana Legal Services**
**Post Office Box 2148**
**Lake Charles, Louisiana 70602**
**(337) 439-0377**
**COUNSEL FOR APPELLEE:**
    **A.S. (Minor Child)**

**Heath J. Dorsey**
**State of Louisiana, Department of Children and Family Services**
**1919 Kirkman Street**
**Post Office Box 1487**
**Lake Charles, Louisiana 70605**
**(337) 491-2545**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Child and Family Services**

**SAVOIE, Judge.**

Appellant C.S.[1] appeals the judgment of the trial court, terminating her parental rights to the minor child, A.S. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On May 21, 2020, the Allen Parish Department of Children and Family Services (DCFS) received a report of possible neglect by C.S. The minor children living in the home were A.S., nine-months-old, J.E., seven-years-old, Kar.E., thirteen-years-old, and Kal.E., fifteen-years-old. The report alleged that C.S. was doing drugs, specifically methamphetamines and marijuana, in the home, around the children, and with the oldest child. It was also reported that another person lived in the home, namely Darren Cappel, who was also doing drugs around the children.

On May 22, 2020, DCFS worker Paula Bowman and Allen Parish Sheriff's Office Deputy Richard Wiseman knocked on the door of C.S.'s home, located in Kinder, Louisiana. After knocking several times, a woman came to the door but refused to let them in. Bowman and Wiseman contacted a judge who issued an oral order to enter the home.[2] Upon entering, Bowman interviewed C.S., J.E., Kar.E. and Kal.E. C.S. denied using drugs, and when she was asked to submit to a urine drug screen, she refused, stating she would not do so unless it was court ordered. She also denied that Darren Cappel lived in the home. She further denied that she had a history of substance abuse and mental illness. She refused to sign forms necessary for DCFS and stopped cooperating with the interview.

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding.

[2] A written judgment was signed May 26, 2020.

Bowman observed drugs and drug paraphernalia in the home. When interviewing J.E., she stated that her mom smokes her "chill lax pipe" and pointed to a bong. J.E. said that it helps her mom relax. J.E. explained that it usually makes her mom fall asleep; however, J.E. has a hard time waking her mother up when the baby is crying. J.E. stated that she normally stays with her paternal grandmother, but she had to go to her mom's house when her grandmother became ill.

Bowman interviewed Sheila Spears, who confirmed that Darren Cappel was living at C.S.'s residence off and on. He is married to C.S.'s sister-in-law Alisha. Sheila Spears stated that she knows Darren Cappel abuses drugs, and he has admitted to it. Sheila Spears explained that D.S., C.S.'s husband and A.S.'s father[3], also does drugs. Sheila Spears stated that C.S. is an excellent mother, and she has never seen her under the influence. Next, Valarie Spears, D.S.'s sister, was interviewed by Bowman. It was her opinion that C.S. is not mentally stable.

Kal.E. was interviewed by Bowman. She explained that she had not been to her mother's house in over two weeks. Kal.E. admitted to smoking marijuana on her mother's bong, while her mother was asleep. Kal.E. stated that she spends most of her time at her father's house and visits with her mother on weekends. Kal.E. also stated that she assumes Darren Cappel does drugs. Kal.E. completed a drug screen and tested negative for all substances.

During her interview with Bowman, Kar.E. admitted to smoking marijuana at least twice a week. Kar.E. had not seen her mother using methamphetamines, and she did not believe she would because of her step-father's (D.S.'s) usage.

---

[3] D.S. was incarcerated at the time of this DCFS visit.

Kar.E. stated that her mother keeps her bong on the closet shelf and the marijuana in the drawer in her bathroom

Mr. Easton was interviewed by Bowman also. He is the father of Kal.E., Kar.E., and J.E. He stated that C.S. is not mentally stable. He also stated that she was using methamphetamines with D.S., which would cause them to hallucinate.

The affidavit in support of the instanter order states:

[T]he following circumstances exists which indicate that there is a substantial, immediate danger to the child, which precludes provision of preventative services as an alternative to removal: The agency attempted to fully assess [C.S.]. [C.S.] was not compliant. [C.S.] is abusing drugs in the home with her children and in the room with her infant child. She has drugs and paraphernalia in her home and despite her knowledge that her children are using them, she has failed to remove these things from her home. [C.S.] continues to struggle with her mental health and has a current warrant for her arrest. [C.S.] also has other known substance abusers living in the home periodically with her children and her. [C.S.] has a history with the agency and [A.S.] was removed in September, 2019. The allegations in that report are similar to the current report. Up until [D.S.'s] incarceration in February, 2020, there was continued domestic violence in the home in the presence of the children. Although the child was returned at the adjudication, [C.S.] continues to have some of the same diminished caretaker protective capacities[,] and [D.S.] is currently incarcerated.

An Oral Instanter Order was issued on May 22, 2020, placing A.S. in the temporary custody of the State. The written judgment was signed on May 26, 2020. A Continued Custody Hearing was held on May 27, 2020. The court ordered C.S. to submit to a hair follicle test. The court found that there were reasonable grounds to believe that A.S. was in need of care, specifically, because C.S. was arrested on an active bench warrant, drugs and drug paraphernalia were found in the home, and there were no suitable caretakers left in the home as A.S.'s father was currently incarcerated. For these reasons, the court continued the custody of A.S. in the care of the State.

3

A petition to adjudicate the minor child, A.S., as a child in need of care was filed on July 14, 2020. DCFS held a family team meeting on June 25, 2020, via conference call, which was attended by C.S. and the child's appointed attorney. Recommendations were made regarding the case plan for C.S., which were:

- [C.S.] will complete a substance abuse assessment with an agency-approved provider. [C.S.] will provide the agency with contact information for the substance abuse service provider. [C.S.] will complete a release of information for the agency in order for the worker to obtain recommendations and progress notes.

- [C.S.] will complete a mental health assessment with an agency-approved provider. [C.S.] will provide the agency with contact information for the substance abuse service provider. [C.S.] will comply with any recommendations made by the mental health service provider. [C.S.] will complete a release of information for the agency in order for the worker to obtain recommendations and progress notes.

- [C.S.] will complete random urine drug screens and/or hair follicle testing as directed by the agency or substance abuse service provider. Failure to comply with random urine drug screens and/or hair follicle testing will be considered as a positive screening.

- [C.S.] will maintain a stable home for [A.S.]. [C.S.] will maintain employment or legal resources to meet the financial needs of [her] children. [C.S.] will provide proof of her income to the worker.

- [C.S.] will attend and successfully complete domestic violence classes with an agency approved provider. [C.S.] will sign release of information forms for the case manager to check on progress.

- [C.S.] will be referred to ETC for Nurturing Parenting after completing the mental health and substance abuse components of the case plan. [C.S.] will comply with any recommendations made by [the] parenting educator. [C.S.] will compete a release of information for the agency in order for the worker to obtain recommendations and progress notes.

- [C.S.] [will] participate in a financial assessment and pay parental contributions or child support as required. [C.S.] will

4

> pay parental contribution[s] of $25 per month pending assessment by Support Enforcement or other court order.

In the report produced by DCFS for the September 2020 Review Hearing, it is noted that C.S. had not completed a substance abuse assessment or mental health assessment, nor had she completed a drug screen or hair follicle test. It was requested that she submit to a drug test on multiple occasions, but she refused each time. She also had not made herself available for home visits by DCFS. While C.S. stated that she was working at the Golden Nugget Casino, she had not provided proof of income or employment to DCFS. Regarding the domestic violence classes, Ms. Sheema Forsythe with Oasis Women's Shelter reported that C.S. would call to schedule an appointment, but she would not participate in her sessions. With regard to the parenting classes, in order for her to be referred to these classes, C.S. must submit two negative drug tests, which she did not do, before she can begin the classes. C.S. made no parental contributions. C.S. did visit with A.S. every other week.

The next review hearing was held in November 2020. The progress report on C.S. was substantially similar to the previous report except that she stated she was no longer employed at the Golden Nugget Casino. She never provided proof of this employment to DCFS. Additionally, due to the aftermath of Hurricane Laura, C.S. missed some visits with A.S., and she stated she was unable to video conference with A.S. because she was without a telephone.

The next review hearing occurred in March 2021. C.S.'s progress was substantially similar to the previous reports. Regarding visitation, the report stated that C.S.'s last in-person visit with A.S. occurred on August 20, 2020. C.S.

conducted one video call with A.S. on October 29, 2020. It was also noted in this report that D.S. passed away on January 9, 2021.[4]

On August 24, 2021, a Petition for Certification for Adoption and Termination of Parental Rights was filed in this case. The petition alleged that C.S. "failed to comply with the court approved case plan and there is no reasonable expectation that she will substantially comply in the future."

A report was prepared for the court on August 23, 2021, describing C.S.'s progress on her case plan. The report stated that C.S. told DCFS she had "completed a substance abuse or mental health assessment and is in treatment at Lake Charles Behavioral Health with Ms. Jennifer Jones." DCFS attempted to verify this information; however, because C.S. did not sign the consent forms sent to her by DCFS, the healthcare provider could not release any information. C.S. also stated that her doctor prescribed her medicine for her mental health, which she was taking. Again, the DCFS worker was unable to verify this information because C.S. did not allow the DCFS worker to visit her home and would not sign the HIPAA releases. Regarding housing, C.S. told DCFS that she is again residing in Kinder, Louisiana. DCFS was unable to verify this information. DCFS tried to set up a home visit with C.S., but she has refused to allow DCFS into her home throughout the case. The report stated that C.S. was not employed. As to the domestic violence education, Ms. Forsythe explained that C.S. had completed three classes over the year that her case plan has been in place. Ms. Forsythe further explained that she had not heard from C.S. in two months at the time of this report. C.S. reported to DCFS that she had attended four sessions with Eddie Windham,

_____

[4] In the petition for termination of parental rights, D.S.'s date of death is listed as January 6, 2021.

6

which DCFS was unable to confirm due to the lack of consents signed by C.S. C.S. was referred to parenting classes with ETC, but she still had not provided the two negative drug tests needed to take these classes. While C.S. stated she was taking a different parenting class, DCFS was unable to verify this information. C.S. did not pay any parental contributions throughout the course of this matter. C.S. began visiting A.S. again every other week in April 2021.

On September 2, 2021, the trial court held an answer hearing on the petition for termination of parental rights. C.S. did not attend. Counsel of record for C.S. made an appearance and informed the court that C.S. would be consenting to the termination of her parental rights. At that time, the trial on the petition for termination was set for September 30, 2021. At the answer hearing, DCFS worker Dawn Wade testified that C.S. had not complied with her case plan. The trial court ordered that A.S. remain in the custody of the State, with adoption as the primary goal and the secondary goal being reunification.

On September 30, 2021, the case was called to proceed with the trial on the merits. C.S. was present. In court, the State moved for a continuance, with no objection from the other parties. The State had recently been made aware that C.S. finally provided releases for medical records from certain healthcare providers. The records were ordered, but they had not yet been received. Also, if C.S. was attempting to comply with the case plan, the State wanted to give her the opportunity to continue to do so before a trial on the termination of her parental rights. The court granted the continuance, wanting to give C.S. every opportunity to comply. The State requested that the court order C.S. to undergo a random drug test at the district attorney's office. Without objection from C.S., the trial court

7

ordered the drug test. The trial on the petition for termination of parental rights was continued to November 9, 2021.

On November 9, 2021, the matter was again continued. The State explained that there has been some compliance by C.S. with her case plan, so that the State did not feel comfortable moving forward with termination of her parental rights. However, the State did note that it needed more substantial progress.

A trial on the merits of the Petition for Certification for Adoption and Termination of Parental Rights was held on January 4, 2022. Several witnesses testified. The first witness was DCFS worker Dawn Wade. Ms. Wade stated that C.S. was assessed a financial contribution of $25 per month, which has never been paid. Regarding safe and stable housing, Ms. Wade explained that, since A.S. had been in State custody, C.S. moved several times. DCFS requested several home visits, which were all denied by C.S. However, C.S. had recently moved into a new apartment in November 2021, and Ms. Wade was allowed to visit that apartment. This was the first home visit DCFS was allowed by C.S. since A.S. first came to be in the custody of the State.

Ms. Wade testified that C.S.'s case plan requires her to provide proof of income to DCFS. From the summer of 2020 through December 2021, C.S. never provided proof of income to DCFS. In December 2021, C.S. provided DCFS with proof of supplemental security income (SSI).

C.S. must also submit to random drug screens as part of her case plan. Ms. Wade testified that there have been several occasions when DCFS had requested C.S. submit to a drug screen and a hair follicle test, and C.S. refused. The court did order C.S. to undergo a drug test on September 30, 2021. Ms. Wade stated that

8

C.S. passed the urinalysis drug screen with a negative test, although she did not follow protocol because she left the facility and came back later in the day.

Because substance abuse was a leading factor in this case, C.S. was required to complete a substance abuse assessment. Ms. Wade testified that C.S. did complete that assessment with Jennifer Jones at Lake Charles Behavioral Health. From that assessment, it was recommended that C.S. complete at least twelve classes with Lake Charles Behavioral Health and continue with follow up treatments. Ms. Wade explained that C.S. had attended some classes, but she had also missed a few of the sessions with her counselor. Therefore, she had not completed the recommendations.

Ms. Wade also testified that a mental health assessment is included in the substance abuse assessment, and C.S. is on medicine for her mental health. C.S. is required, per her case plan, to attend parenting classes through ETC; however, Ms. Wade testified that C.S. had not attended these classes. C.S. must submit two negative drug tests to begin these classes, and she had not done so. She only submitted the one drug test that was ordered by the court. Instead, C.S. attended some parenting classes with Lake Charles Behavioral Health.

C.S. testified that she attends Lake Charles Behavioral Health three times per week. C.S. stated that she is drug tested at Lake Charles Behavioral Health, and she passed those tests. However, C.S. did not provide evidence of these tests. She said she was on her way to completing her case plan. Regarding her living situation, C.S. testified that she moved into her apartment in July 2021. On cross-examination, counsel for the State pointed out that Ms. Wade requested a home visit in August 2021, September 2021, and October 2021, all of which were denied by C.S. Counsel also noted that this was the second time A.S. was removed from

9

C.S.'s care. A.S. was first removed in September 2019, but she was ultimately returned to the home. C.S. testified that her three older children do not live with her. Her three eldest children live in Lake Charles with their paternal grandmother.

After hearing the evidence, the trial court found:

> We are talking about a young child who is 2 years old, who has basically been in State's care most of its life. Under the Article 1015(6), the court is to consider the child's age, [her] need for safe, stable, and permanent home. This concerns the Court specifically or particularly because of the young age of this child. This case has been lingering on for eighteen months from the time the child first came into care. This Petition for Termination of Parental Rights was filed in August of 2021. From the time the child came into State's care from July of 2020 to August of 2021, there was hardly any compliance by the mother working her case plan. Her location was pretty much unknown to the Agency. There was no stability in her life, no source of income, no compliance with some of the requirements to be evaluated by, to be assessed and to undergo certain requirements. She was not able to prove for the first twelve or fourteen months, probably fourteen months, she was not able to prove that she had any housing that was stable and secure. She was not able to show or prove that she had income. She was not able to show or prove about some of the drug screens and substance abuse and being evaluated. The court does acknowledge that since [this] petition was filed - - since the Petition was filed mother did start to make efforts. The testimony that the Court heard was that if, under optimum circumstance, if the mother were permitted to [continue] to work this case plan that it would probably take, under great - - under perfect circumstances, another four to six months, that is if she does everything that she is supposed to be doing. The Court, because of the age of the child, and because the directive under the law, is that the Court consider that age and consider the child's need for a safe and stable and permanent home, that we cannot afford to continue to wait. The Court finds that the case has been proven by clear and convincing evidence that the mother did fail to substantially comply for the first fourteen months.

The trial court terminated C.S.'s parental rights as to A.S., finding that it was in the child's best interest. C.S. now appeals.

## ASSIGNMENTS OF ERROR

C.S. assigns the following errors:

10

1. The court manifestly erred in terminating the parental rights of C.S. to her minor child, A.S., as the evidence was insufficient to clearly and convincingly prove that C.S. had not substantially complied with the case plan or that C.S. intended and did abandon the child.

2. The court manifestly erred by finding that the State proved by clear and convincing evidence that termination of C.S.'s parental rights was in the best interests of A.S.

## LAW AND DISCUSSION

### I. Standard of Review

This court in *State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72, explained:

> A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id.* Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id*; La.Ch.Code art. 1037.

The trial court's judgment terminating parental rights is reviewed under a manifest error standard of review. *State in the Interest of M.J.F.*, 18-584 (La.App. 3 Cir. 12/6/18), 261 So.3d 879.

> A trial court's factual determinations as to whether there has been substantial compliance with a case plan, whether a significant indication of reformation has been shown, and whether the parent is likely to reform will not be set aside unless the record reflects that the trial court is clearly wrong.

11

*State ex rel. G.O.*, 10-571, pp. 5-6 (La.App. 3 Cir. 6/8/11), 68 So.3d 636, 640, *writ denied*, 11-1512 (La. 7/21/11), 67 So.3d 479.

II.     *Applicable Children's Code Articles*

The trial court in this case terminated C.S.'s parental rights under La.Ch.Code art. 1015(6), which states:

The grounds for termination of parental rights are:

. . . .

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) and (D) provides the grounds for lack of parental compliance with a case plan, stating:

C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The trial court applied the factors of La.Ch.Code art. 1036(C) and (D) to the present case, finding:

The Court looks more specifically toward the items in Article 1036, proof of parental misconduct, and looks at C, Subsection 1, parent[']s failure to keep the Department apprised of her whereabouts, that applies. Number 4, the parent[']s failure to contribute to the costs of the child's care applies. The parent[']s repeated failure to comply with the requirement program of treatment and rehabilitation applies. Failure to provide negative tests for synthetic or controlled dangerous substances applies. And I acknowledge that applies more for the first fourteen months than it has for the last three months. But I cannot - - it is the Court's opinion that this case dragged on long enough. So, the Court does grant the State's request to terminate parental rights, does find that it is in the best interest of the minor [child]. The Court also acknowledges that there is a couple, a loving couple, who is available to continue to care for that child, and [they] offer that

13

permanent placement that that child needs and desires[] or needs and requires. And they are an adoptive placement.

Louisiana Children's Code Article 1037(B), provides:

When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

At trial, there was evidence from Stacy and Kevin Hartstine, A.S.'s foster parents. Stacy Hartstine stated that initially they did not consider being a prospective adoptive home for A.S. However, after having A.S. in their home, they found they love her, and they have a good relationship with C.S. Stacy Hartstine testified that they work well with C.S.

### III. Assignments of Error

In her assignments of error, C.S. argues that the trial court erred in terminating her parental rights because the evidence was insufficient to clearly and convincingly prove that C.S. had not complied with her case plan or that she intended to abandon A.S. She also complains that the trial court erred in finding that termination was in the best interest of A.S. We disagree.

*Substance Abuse Assessment with an Agency Approved Provider*

Ms. Wade testified that C.S. had completed the substance abuse assessment. Based on the assessment, it was recommended that C.S. complete at least twelve classes with Lake Charles Behavioral Health and also attend follow-up treatments. Ms. Wade testified that C.S. attended some of the classes and missed some of the classes. Therefore, C.S. has not completed the recommendations.

*Mental Health Assessment with an Agency Approved Provider*

The record reflects that a mental health assessment was included in the substance abuse assessment, and C.S. was prescribed medication for her mental health as a result.

*Random Drug Screens and/or Hair Follicle Testing*

C.S. was repeatedly asked to submit to a drug screen or hair follicle test by DCFS throughout the year and a half that this case was pending. She never submitted to the requests. She only submitted one urinalysis test that was court ordered. This test came back negative; however, C.S. did not follow the drug testing protocol by leaving the facility and then returning for her test. C.S. testified that she was drug tested at lake Charles Behavioral Health and that she passed those tests. C.S. did not provide evidence of these tests to DCFS or introduce these tests into evidence.

*Stable Home/Employment/Proof of Income*

C.S. was required to provide a stable home for her family. The record indicates that DCFS requested home visits with C.S. multiple times over the year and half long period that this case was pending. All of these requests were denied by C.S. C.S. moved several times over this period. C.S. testified at trial that she moved into her current apartment in Kinder in July 2021. On cross-examination, counsel for DCFS pointed out that home visits were requested in August 2021, September 2021, and October 2021. All of these requests were denied by C.S. Immediately prior to trial, C.S. finally allowed DCFS to visit her home.

The record further shows that C.S. is not employed and has not been employed throughout the course of this matter. C.S. claimed that she was employed at the Golden Nugget Casino for a month or two during the summer of 2020; however, she never provided proof of said employment to DCFS, and there

is no evidence of this employment in the record. Immediately prior to trial, in December 2021, C.S. provided proof of SSI to DCFS.

*Domestic Violence Classes*

According to the August 21, 2021 report prepared for the court, Sheema Forsythe stated that C.S. completed three classes since her case plan was put in place in the summer of 2020. At the time of that report, Mrs. Forsythe had not heard from C.S. in two months. However, at the January 2022 trial, Ms. Wade testified that C.S. had started going to the domestic violence classes, but she had not been since the beginning of December 2021.

*Parenting Classes*

As part of her case plan, C.S. was referred to ETC for Nurturing Parenting classes. Two negative drug tests were required in order for C.S. to begin these classes. C.S. never provided the two negative drug tests necessary to take these classes.

*Parental Contribution*

Finally, C.S. was ordered to pay $25 in parental contributions towards A.S.'s care and support. C.S. never paid the parental contribution.

After a review of the record, the trial court found that C.S. failed to substantially comply with her case plan for the first fourteen months that A.S. was in the custody of the state. The trial court further found that due to the age of A.S. and considering the need for a safe, stable, and permanent home, it was in A.S.'s best interest to terminate C.S.'s parental rights.

A.S. has been in the custody of the state since she was nine-months-old. This is the second time she was placed in the custody of the state in her short life. A.S. was previously removed and returned to C.S. prior to the current placement.

C.S. has three other children, all of whom do not live with her. C.S. made no progress towards her case plan for over a year. She went months without seeing A.S. during this time. C.S. never contributed financially to A.S.'s care. Most egregiously, C.S. never submitted to drug screenings requested by DCFS. A.S. was removed from the home due to C.S.'s drug use, and her refusal to submit to these drug tests during the pendency of this matter is telling. Only one ground for termination needs to be found in order to terminate parental rights. For these reasons, we cannot say that the trial court was clearly wrong in terminating C.S.'s parental rights. We do not find the trial court's factual conclusions to be manifestly erroneous.

We find that the evidence supports the trial court's finding that the state proved by clear and convincing evidence that the parental rights of C.S. to her daughter A.S. should be terminated, and that termination of parental rights is in the best interest of the child.

## CONCLUSION

The judgment of the trial court is affirmed.

**AFFIRMED.**