STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-500


STATE IN THE INTEREST OF J.A.



**********


APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 15-JV-017866
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of Marc T. Amy, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


                                                            **AFFIRMED.**

**S. Marie Johnson**
**Public Defender's Office**
**106 West Berard Street**
**St. Martinville, Louisiana  70582**
**(337) 394-1446**
**Counsel for Appellant:**
        **D.A. (mother)**

**Diane E. Cote**
**Attorney at Law**
**825 Kaliste Saloom Road**
**Brandywine III, Room 150**
**Lafayette, Louisiana  70508**
**(337) 262-5913**
**Counsel for Appellee:**
        **State of Louisiana, Department of Children & Family Services**

**Jocelyn Sias**
**The Sias Firm, LLC**
**203 West Main Street, Suite 105**
**New Iberia, Louisiana 70560**
**(337) 321-9516**
**Counsel for Appellee:**
      **J.B. (father)**

**Denise Henderson**
**Raveen Hill**
**Mental Health Advocacy Service**
**Child Advocacy Program**
**302 Dulles Drive, Suite U-47**
**Lafayette, Louisiana 70506**
**(337) 262-2030**
**Counsel for Appellee:**
      **J.A. (child)**

**KEATY, Judge.**

D.A.[1] appeals the judgment of the trial court terminating her parental rights to her minor child, J.A. For the following reasons, the trial court's judgment is affirmed.

## FACTS & PROCEDURAL HISTORY

The mother, D.A., and the father, J.B., together produced one female child, J.A., who was born on October 6, 2012. On December 28, 2014, the State of Louisiana, Department of Children and Family Services (DCFS) received a report that J.A. was an alleged victim of dependency, lacked parental supervision, and lived in an inadequate shelter. Following an initial investigation into the allegations, the DCFS recommended that it retain temporary custody of J.A., who had been living with her mother in the home of her maternal grandmother, M.A. An oral instanter order was issued placing J.A. in the temporary custody of the DCFS on January 4, 2015. On January 7, 2015, a written instanter order with a supporting affidavit was filed and signed by the trial court and contained the information regarding DCFS's investigation into the reported claims. On that same date, a continued custody hearing was held which resulted in the trial court signing a formal judgment maintaining custody of J.A. with the DCFS. On January 8, 2015, the State filed a Petition of Child in Need of Care alleging that J.A. was a victim of neglect as defined under La.Ch.Code art. 603(18), secondary to the mother's substance abuse and mental health illness along with the absence of the father. The allegations contained in the petition were denied by D.A. at the answer hearing on February 12, 2015. The trial court thereafter granted the State's request in its petition.

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in the proceeding.

Following an adjudication hearing and pursuant to the trial court's written judgment dated March 10, 2015, J.A. was adjudicated a child in need of care. The trial court found that it was in J.A.'s best interest to remain in the custody of the DCFS. The written judgment advised D.A. of the case review and permanency review procedure along with her obligation to cooperate with the department and to comply with all of the case plan's requirements. According to the judgment, failure to comply with the case plan could result in termination of parental rights.

Thereafter, multiple permanency review hearings occurred wherein the trial court was presented with a DCFS case plan, DCFS progress reports, and supporting evidence. Initially, the DCFS formulated a court-approved case plan outlining a strategy for reunification between D.A. and J.A. The strategy for reunification subsequently changed to adoption based upon D.A.'s continued substance abuse and mental health issues.

On May 3, 2016, the DCFS filed a formal Petition for Termination of Parental Rights and Certificate of Adoption, seeking to terminate D.A. and J.B.'s parental rights and clear the way for the foster parent to adopt J.A. Trial on the petition occurred on August 19, 2016. After considering the testimony and evidence offered at trial, the trial court orally terminated the father's parental rights and continued the matter with respect to the termination of D.A.'s parental rights. The matter proceeded to trial on October 31, 2016. After hearing the testimony and evidence presented, the trial court terminated D.A.'s parental rights for reasons stated in open court. It subsequently issued a written Judgment of Termination of Parental Rights and Certification for Adoption on November 16, 2016, terminating the parental rights of both parents. D.A. appealed.

The appeal was lodged with this court on May 30, 2017. On May 31, 2017, we issued a rule for D.A. to show cause why the appeal should not be dismissed as

2

untimely filed. Based on the allegations contained in the Appellant's response brief, this court ordered a limited remand to allow the trial court to conduct a contradictory hearing on the untimeliness issue. *State in Interest of J.A.*, 17-500 (La.App. 3 Cir. 6/28/17), 224 So.3d 411. According to trial court's minutes dated August 18, 2017, which is in the supplemental record on review, the trial court found that D.A.'s appeal was timely filed.

On appeal, D.A. contends that the trial court erred in granting judgment in favor of the DCFS, terminating her parental rights.

## STANDARD OF REVIEW

"In a termination proceeding, the appellate court will not set aside the trial court's findings of fact unless it was manifestly erroneous." *State in Interest of J.M.L.*, 47,201, p. 5 (La.App. 2 Cir. 4/11/12), 92 So.3d 447, 450. Questions of fact in a proceeding for termination of parental rights include the "issue of parental compliance with a case plan, the parent's expected success of rehabilitation, and the expectation of significant improvement in the parent's condition and conduct." *Id*.

## DISCUSSION

In her assignment of error, D.A. contends that the trial court erred in granting judgment in favor of the DCFS, terminating her parental rights.

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id*. Because termination of parental rights is a severe action,

3

the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

In this case, the trial court's written judgment states that the DCFS "met its burden of proof by clear and convincing evidence under Louisiana Children's Code Articles 1015(4) (now 1015(5) and 1015(5) (now 1015(6)[.]" It explained:

> [T]hat at least one year has elapsed since the child was removed from the parents' custody pursuant to a court order; case plans for services as to the minor child were formulated for the mother and father and approved by the court; that said parents have failed to substantially comply with their respective case plans, including but not limited to a lack of mental health treatment and substance abuse treatment; that for a period of at least four months as of the time of the trial, despite a diligent search, the whereabouts of the child's father continued to be unknown, that the father has failed to maintain significant contact with the child by visiting her or communicating with her for any period of six consecutive months; that said parents have failed to provide significant contributions to their child's care and support for a consecutive six month period; that the conditions that led to the removal or similar potentially harmful conditions continue to persist; that there is no reasonable expectation of significant improvement in said parents' condition or conduct in the near future; that termination of parental rights is in the best interest of the minor child, [J.A.], for the reason set forth above.

The trial court's judgment terminating D.A.'s parental rights was based upon the following grounds enunciated in La.Ch.Code art. 1015:

> (5) Abandonment of the child by placing [her] in the physical custody of a nonparent, or the department, or by otherwise leaving [her] under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

4

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting [her] or communicating with [her] for any period of six consecutive months.

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and [her] need for a safe, stable, and permanent home.

Lack of parental compliance with a case plan under La.Ch.Code art. 1015(6)

may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

Similarly, lack of a reasonable expectation of significant improvement in the parents' conduct under La.Ch.Code art. 1015(6) may be evidenced by one or more of the following:

>(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

>(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

>(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

La.Ch.Code art. 1036(D).

Applying the aforementioned law, we must determine: (1) whether the DCFS established the grounds for termination pursuant to La.Ch.Code arts. 1015(5) and/or 1015(6) by clear and convincing evidence; and (2) whether it is in J.A.'s best interest to terminate D.A.'s parental rights. *See State in Interest of M.C.*, 16-69 (La.App. 3 Cir. 6/1/16), 194 So.3d 1235, *writ denied*, 16-1273 (La. 9/16/16), 205 So.3d 918.

DCFS case managers assigned to this matter testified at trial. Bobby Bernard testified that he was the family's case worker from January 4, 2015 through July 2015. Bernard noted that the DCFS was previously involved in a family service case with D.A. and J.A. from January 28, 2013 through April 21, 2014, after J.A. was born a "drug exposed newborn." Medical records from Women's & Children's Hospital, which were submitted into evidence at trial and in the record for our review, confirm J.A. was a drug exposed newborn arising from "maternal [Tetrahydrocannabinol] THC use." A Department of Social

6

Services, Office of Community Services' written child abuse report issued after J.A.'s birth, and which was also submitted into evidence, notes that J.A.'s "drug screen is positive for cannabinoids – THC, which is marijuana. Mother admits to using marijuana 'about once per week.'"

With respect to the instant matter, Bernard testified that J.A. came into DCFS's custody on January 4, 2015, due to inadequate shelter, lack of adequate supervision, and D.A.'s substance abuse. Bernard stated that D.A., who did not have independent housing, was residing at the home of her mother and J.A.'s grandmother, M.A. According to Bernard's testimony, he met with D.A. to discuss a case plan that she needed to follow in order to be reunited with her daughter. The case plan, which the DCFS noted in its permanency review reports submitted to the trial court prior to the permanency review hearings, required D.A. to meet the following goals: (1) take random drug screens; (2) maintain a safe home, with connected utilities, that adequately meets J.A.'s needs; (3) participate in mental health treatment and medication management; (4) maintain contact with J.A.; and (5) cooperate with the DCFS and make herself available for contact. Bernard testified that D.A. only complied with the parenting component of the plan by completing a parenting class and visiting with J.A.

D.A. submitted to random drug tests from February 2015 through April 2015, according to Bernard's testimony. He advised that some of the results were positive for synthetic marijuana. Bernard revealed that D.A.'s failure to submit to a drug test on April 10, 2015, rendered her results positive for illicit drugs on that date. He opined that D.A.'s main problem was her use of synthetic marijuana, which continued while she was in treatment. His testimony is supported by the trial testimony of D.A.'s mother, M.A., who testified that D.A. refuses to stop smoking synthetic marijuana. Bernard advised that D.A. was minimally

complying with the substance abuse treatment program provided by Keys For Sober Living, L.L.C. (Keys), and that "she always admitted when she used synthetic marijuana." Bernard testified that D.A. admitted to smoking it "almost [on] a daily basis." Bernard referenced a June 2015 incident wherein D.A., who was at the courthouse, left during her lunch break to retrieve synthetic marijuana. According to Bernard's testimony, D.A., along with two of Bernard's former clients, subsequently retreated to D.A.'s home where they smoked it.

Bernard testified that D.A. was referred to Iberia Mental Health Clinic (Iberia Health) for treatment in May 2015. According to Bernard, D.A. opined that she did not need treatment although she went to her first two appointments. He cautioned that D.A. failed to present to her doctor's appointments on June 22, 2015 and July 10, 2015. His testimony is supported by the medical records submitted into evidence at trial. Bernard referenced a meeting that occurred at his office between him and D.A.'s sister, Shawana Thibadeaux, regarding her possible role as J.A.'s caretaker. During their meeting, D.A. appeared at the office and began fighting with Ms. Thibadeaux, according to his testimony. A police report dated July 20, 2015, and submitted into evidence at trial, reveals that D.A. and Ms. Thibodeaux were issued a summons for disturbing the peace following a physical altercation between the siblings.

Bernard noted that D.A.'s substance abuse contributed to her erratic behavior exhibited during his visits to M.A.'s residence where D.A. resided. Bernard testified that during these visitations, he observed multiple arguments between D.A. and M.A. According to M.A.'s own trial testimony and a November 22, 2015 police report from the St. Martin Parish Sheriff's Office, one of these arguments resulted in D.A. being arrested for domestic abuse battery after punching her mother. He revealed that at the end of June 2015, the front door of

8

M.A.'s residence contained broken glass which posed a safety threat. Bernard testified on cross-examination that D.A. punched a door and broke a window at the home. D.A.'s own trial testimony reveals that she punched the glass in the front door of the home which required her to have stitches. He referenced a December 28, 2014 report regarding inadequate shelter based upon observations of clutter, rats, and rat feces inside the home, which he opined constituted a safety hazard for J.A.

As to parental contributions, Bernard testified that D.A.'s parental contributions were approximately ten dollars. He stated that D.A. purchased food and an outfit for J.A. Deidra Chevalier, a DCFS foster care worker involved in the matter, testified at trial that toys D.A. may have given to J.A. during their visitations were not a replacement of her parental contributions that she was required to pay directly to the State of Louisiana. Chevalier testified that D.A. never provided parental contributions.

Chevalier further testified that she was involved with the family since August 2015 and was "the current case worker" at the time of trial. She opined that D.A. failed to substantially comply with the case plan, by stating:

> [D]ue to the fact of not receiving the advice of professionals to comply with working the case plan to get the treatment help as far as mental health and substance and inpatient treatment because of the seriousness of the substance that she was addicted to or is still addicted to . . . I would have to say [she] is noncompliant.

Chevalier classified D.A.'s behavior as sporadic, meaning that she would act fine one day and then exhibit outrageous behavior the following day. She opined that J.A. should not return to D.A. because of her continued substance abuse and mental health issues for which D.A. refuses to seek help.

Chevalier testified that D.A. was referred to Iberia Health for treatment. She also indicated that D.A. never showed up to complete the actual assessment or

other previously-scheduled appointments. On the other hand, Chevalier noted that D.A. voluntarily, and without having a previously-scheduled appointment, walked into the clinic and sought treatment on one occasion. According to Chevalier's testimony, D.A. was unable to seek treatment that day as Iberia Health informed her that she needed to schedule an appointment. She explained that D.A. subsequently admitted to falsely advising the DCFS that she had scheduled a return appointment with Iberia Health, "just to get us off her back about the actual date."

Chevalier's testimony indicates that she visited M.A's home twice where she observed an old gas heater that posed a safety risk. Chevalier explained that she thereafter was unable to return to the home because of D.A.'s "continual violent behaviors." According to Chevalier's testimony as well as with a police report filed into evidence at trial, on one occasion, D.A.'s violent behavior led to her arrest for assault on a child welfare worker,. Chevalier noted that D.A.'s arrest occurred after she called the DCFS on September 30, 2015 and stated: "'I'm going to go to New Orleans and get a chopper and kill all of y'all *****, shoot all of y'all *****.'"

With respect to substance abuse issues, Chevalier's testimony along with medical records from Pathways Community Health (Pathways Health) submitted into evidence at trial, reveal that D.A. tested positive for benzodiazepines on July 6, 2016.[2] D.A. did not fail all of her drug tests, according to Chevalier's testimony. She cautioned, however, that D.A. admitted to using synthetic marijuana prior to some of her drug tests which rendered negative results. Chevalier's testimony is confirmed by D.A.'s trial testimony in this regard. Chevalier further advised that D.A. completed her substance abuse courses but relapsed in September 2015,

---

[2] Benzodiazepines are a class of drugs used for treating anxiety and other disorders and include the following brand-named drugs: Valium, Ativan, Xanax, and Klonopin.

resulting in a positive test for illicit drugs. As a result, D.A. sought additional treatment from Keys in December 2015, according to Chevalier's testimony. She advised that in February 2016, Keys secured a bed for D.A. at Acadiana Recovery Center (Acadiana Recovery), an in-patient facility located in Lafayette. Chevalier testified that when a DCFS van was transporting D.A. to Acadiana Recovery, she exhibited threatening behavior which caused the driver of the van to turn around and bring her home. D.A., in her own trial testimony, revealed that she called Chevalier "a liar and a crook" when she was being transported in the van. Chevalier noted that D.A.'s family thereafter brought her to Acadiana Recovery to be admitted although she was refused by the facility due to her having to go through detoxification.

According to Chevalier's testimony, D.A. was referred to Baton Rouge Detoxification Center (Baton Rouge Detox) in April 2016 by Dr. Joseph Wilson of Keys. Chevalier advised that D.A. was admitted to the facility on April 14, 2016, and discharged on April 16, 2016, following an altercation between D.A. and one of the facility's clinicians. Chevalier testified that D.A. admitted to her that an altercation occurred that resulted in her discharge. Chevalier advised that D.A. was admitted for in-patient treatment at Pathways on July 5, 2016, and subsequently discharged on July 6, 2016. D.A. voluntarily left Pathways because "she did not want to stay for that long period of time," according to Chevalier. D.A. was thereafter supposed to seek outpatient treatment from Keys, according to Chevalier. Chevalier revealed that she was informed by Keys that D.A. "had never attended again even after being re-deferred."

Chevalier recalled that D.A. confessed to an incident which occurred on August 31, 2015, at McDonalds wherein she slapped her manager and was subsequently arrested. Although D.A. claimed to have worked at McDonalds and

11

in the sugarcane industry, she failed to provide check stubs or other proper documentation showing her employment status, according to Chevalier. D.A.'s trial testimony reveals that she knew of the requirement to provide Chevalier with proof of employment. D.A. further agreed that she worked at McDonalds, planted sugarcane, and has been working with a man painting his rent houses. Bernard's testimony likewise reveals that D.A. was unemployed during his involvement with the instant matter, that D.A. previously worked for McDonalds, and that she failed to provide check stubs confirming her employment.

As to J.A.'s health, Chevalier agreed with Bernard's testimony that J.A. was a substance exposed newborn. Chevalier noted that J.A. was assessed by her pediatrician, Dr. Allison Rader, who thereafter referred her to Tulane Center for Autism and Related Disorders to be evaluated for the presence of an Autism Spectrum Disorder (ASD). According to the medical report in the record, although J.A. was found not to have autism, she was diagnosed with neurodevelopmental disorder associated with early developmental deprivation caused by child neglect. Chevalier revealed that D.A. failed to seek treatment for J.A. at Iberia Health, which facility offered to assist J.A. following a request by the DCFS. Chevalier claimed that J.A. has made "significant" progress since DCFS has assisted in getting her medical care. She indicated J.A.'s speech along with her ability to socialize and interact has improved. She further noted that J.A. refers to her foster mother as "mom."

Janice Barideaux, a Court Appointed Special Advocate (CASA) volunteer, testified at trial on behalf of the DCFS. Barideaux testified that she interviewed D.A. on multiple occasions wherein D.A. refused to listen to her advice and made several threats. Barideaux agreed with Chevalier's testimony that D.A. would self-report to smoking synthetic marijuana despite her negative drug test results. She

recommended that J.A. not return to D.A. and be placed for adoption. Her recommendation was noted in a CASA report that she prepared and submitted to the trial court in preparation of a July 14, 2015 review hearing, and which was offered into evidence at trial in the instant matter. Therein, Barideaux noted that CASA did not agree with the DCFS's recommendation for reunification based upon the following concerns: D.A.'s poor hygiene; D.A.'s ongoing abuse of drugs and her uncontrollable outbursts of anger; and the condition of the home. The CASA report noted the possibility that J.A. may have been molested.

D.A., who also testified at trial, admitted that she was diagnosed with conversion disorder following Hurricane Katrina. She was placed on Zoloft[3] but later stopped taking it because she did not like it, according to her testimony. D.A. agreed that J.A. was born substance exposed because she smoked regular marijuana, and not synthetic marijuana, during her pregnancy. D.A. stated that she fully participated with the substance abuse component of the case plan by undergoing all drug screens. When the results of her drug screens were negative, D.A. self-reported that she continued to use synthetic marijuana, according to her testimony. D.A. testified that she had not smoked synthetic marijuana in the month prior to trial. She noted that she complied with the mental health component of the case plan. D.A. agreed that she left Keys against medical advice because she felt it "was unnecessary." She denied being terminated from Baton Rouge Detox following a fight with a technician. When asked again whether she was terminated, D.A. explained: "There's racism over there at that Baton Rouge Detox. Very racist." When asked a third time whether she was terminated, D.A. responded, "So said." When asked whether D.A. was involved in a physical

---

[3] Zoloft is used to treat depression, obsessive-compulsive disorder, and panic and anxiety disorders.

13

altercation with her mother, D.A.'s response was: "I don't remember." She subsequently agreed, however, that her charges for simple battery were dismissed. D.A. indicated that she never hit her mother, and that her mother was "[p]retty much" lying.

When asked whether she tested positive for benzodiazepines on July 5, 2016, she said, "I never used it." On the other hand, she stated that she took her grandmother's medication to sleep, "but it made me fail my drug screen and I never took it since." When asked about the DCFS's discontinuing home visits because of her violent and threatening behavior, she said the only person she threatened was Megan James. According to the affidavit in support of the instanter order, Megan James was the DCFS employee who initially investigated the matter. D.A. testified that she said the following about James: "I should kill her and take - - let her children be without her mama." D.A. denied threatening to shoot other DCFS employees.

D.A.'s behavioral and substance abuse issues were the subject of a multiple DCFS reports filed with the trial court during the course of the proceedings. Specifically, a DCFS report dated July 7, 2016, states:

> At this time, [D.A.] has demonstrated to the agency that she has a severe substance abuse and anger management problem. Although [D.A.] has participated and completed substance abuse treatment, she continues to admit to abusing and positive drug screens of synthetic marijuana. She has also maintained regular attendance and completed Keys for Sober Living; however she continues to abuse illegal substances. Due to unaddressed mental illness, [D.A.'s] violent threating [sic] behaviors, substance abuse history [D.A.] has displayed diminished capacity to provide safety and stability for her child[.]

Based on our review of the record, we conclude that the DCFS has satisfied its burden of proving that D.A. has not substantially complied with the case plan, and there is no reasonable expectation of improvement in her conduct. The trial testimony of each of the case managers, as well as the numerous DCFS reports

14

filed with the trial court over the course of these proceedings, demonstrate a lack of substantial compliance. The evidence is clear that D.A. is incapable of managing the care of J.A. in light of her ongoing substance abuse and mental health issues.

We now turn to the issue of whether it is in J.A.'s best interest to terminate D.A.'s parental rights. The documentation in the record reflects that J.A. has found a loving and secure home with the current foster mother. The record indicates that J.A. is thriving in her new home. J.A. was moved from D.A.'s custody at approximately the age of two years and three months and placed into multiple foster homes. When J.A. was approximately three years old, she was placed and remains in a certified foster home. According to the DCFS report dated July 7, 2016:

> Since [J.A.'s] move she has been doing excellent. Her skin condition has improved and [J.A.] cries every time she is picked up by the agency for visitations with her mom or just a home visit. [J.A.] fears being moved again and states that this is her new home. [J.A.] has adjusted home with [the foster mother] and has her own room. All [J.A.'s] medical, recreational, social needs have been met. [J.A.] attends appointments regularly, attends school regularly and attends visitations with her mom. [J.A.] is currently attending A little touch of Love day care. She is continuing to receive Special Education services through Iberia Parish School Board. [J.A.] is currently receiving occupational therapy, speech therapy, and will be re-evaluated for Physical Therapy. [J.A.] is also receiving services from Acadiana Area Human Services District which provides disability services. [J.A.] has been approved to receive disability services through the agency.

The report reveals that the foster mother has "assured all of J.A.'s basic needs were met." It further notes that:

> [J.A.] is well bonded and attached to her foster parent. This placement is the least restrictive and most appropriate and familiar setting consistent with the needs of the minor child. [The foster mother] has created a loving and structured environment for [J.A.] to thrive in. [J.A.] regularly attends family gatherings and is a part of [the foster mother's] family. [The foster mother] is interested in adopting [J.A.] in the event she becomes freed for adoption.

In termination proceedings, the fundamental interest of the parents must be balanced with the interest of the child, and "courts of this state have consistently found the interest of the child to be paramount over that of the parent." *State ex rel. J. M.*, 837 So.2d at 1252. In this case, the evidence and testimony reveal that D.A. wants to reunite with her daughter. The evidence and testimony also reveal that D.A. continues to suffer from substance abuse and mental health issues, which render her unable to properly care for J.A. J.A. has a paramount interest in remaining in the stable and loving environment provided by the foster mother, with the security and permanency her adoption will provide J.A.

We find that the trial court did not commit manifest error in its determination that it was in the best interest of J.A. to terminate the parental rights of D.A. and free the minor child for adoption.

## DECREE

For the foregoing reasons, the trial court's judgment is affirmed. All costs associated with this appeal are assessed to D.A.

**AFFIRMED.**