NOT DESIGNATED FOR PUBLICATION

# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 22-731

**STATE IN THE INTEREST OF**

**Z. C.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2021-217
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Gary J. Ortego, Judges.

**AFFIRMED.**

Jane Hogan
Attorney at Law
310 North Cherry Street
Hammond, LA 70401
(985) 542-7730
COUNSEL FOR OTHER APPELLANT:
      J. C. (mother)

Chantel Conrad
Regional Attorney
825 Kaliste Saloom Rd
Brandywine III, Suite 150
Lafayette, Louisiana 70508
(337) 262-2250
COUNSEL FOR OTHER APPELLEE:
      Department of Children and Family Services

Jessica R. Reaux
Indigent Defenders Office
109 Stewart Street
Lafayette, Louisiana  70501
(337) 484-1001
COUNSEL FOR OTHER APPELLEE:
      Q. J. S. (father)

**WILSON, Judge.**

In this termination case, the mother, J.C.[1], appeals the judgment of the trial court terminating parental rights to the minor child, Z.C.  For the reasons expressed below, we affirm the judgment of the trial court.

I.

## ISSUES

In this appeal we must decide:

(1)  whether the juvenile court erroneously terminated J.C.'s parental rights because she substantially complied with her case plan and there is a reasonable likelihood of further compliance in the near future;

(2)  whether the juvenile court erred by finding the State proved by clear and convincing evidence that termination of J.C.'s parental rights was in the best interest of Z.C.; and

(3)  whether the juvenile court erred by finding that J.C. had abandoned her child by failing to substantially contribute to the cost of care for six consecutive months.

II.

## FACTS AND PROCEDURAL HISTORY

In January of 2021, the Lafayette Parish Department of Children and Family Services (DCFS) received a report that J.C. had given birth to a child, E.C.[2], who tested positive for Amphetamines and Methamphetamines at birth.  During the course of its investigation, DCFS opened a case on Z.C. amid concerns that J.C. continued to use drugs and was a victim of domestic violence.  J.C. admitted she had

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding.
[2] E.C. was privately adopted.

a substance abuse issue and there was ongoing domestic violence in the home from the child's father, Q.S. J.C. was referred to Family Services and Intensive Homebuilder Services.

J.C. failed to follow the service providers' recommendations and failed to apply for a restraining order against Q.S. As a result, Z.C. was removed and placed into the custody of the State on March 5, 2021, based on allegations of neglect by way of drug affected newborn and dependency. J.C. stated that she was raised in an abusive foster family and would not provide any names for potential relative placements. Z.C. was placed with Brooke Taylor, a qualified foster home and adoptive placement. On June 23, 2021, Z.C. was adjudicated a child in need of care.

DCFS held a family team meeting on April 29, 2021, which was attended by J.C. At this meeting, the goal was reunification with the concurrent goal of adoption. Each parent was given a case plan.[3] J.C.'s case plan consisted of:

- [J.C.] will maintain safe and stable housing to meet the needs of the child. The home should have adequate food and working utilities.

- [J.C.] will be referred for an inpatient substance abuse treatment program and will comply with all recommendations.

- [J.C.] will submit to random urine, oral, and/or hair screens.

- [J.C.] will be referred for a mental health assessment and will comply with all recommendations and treatment as it relates to her mental health, participate in parenting education and nurturing with Extra

---

[3] Q.S.'s whereabouts were unknown for much of the life of the case. He was eventually discovered to be incarcerated and had been transferred multiple times due to charges existing in various locales. He was appointed a curator but did not actively take part in any of these proceedings and did not work his case plan. Q.S. has not appealed the termination.

Mile. [J.C.] will comply with program recommendations and upon completion provide caseworker certificate of completion.

- [J.C.] will support her child while in foster care and agree to pay $100 monthly.

- [J.C.] will participate in a gambling problem counseling and comply with all program recommendations.

- [J.C.] will be referred and participate in a domestic violence program for victims. [J.C.] will provide caseworker a certificate of completion.

- [J.C.] will update and inform caseworker of any significant changes or updates that pertain to her case in a timely manner.

In the report produced by DCFS for the August 17, 2021 hearing, it is noted that "[J.C.] continues to test positive for substances, has not had stable housing, missed drug screens, unable to manage her income, and is unstable with her mental health." The report reveals J.C. had completed a 28-day inpatient substance abuse program with Victory Addiction Center in Lafayette on May 28, 2021. She was discharged and diagnosed with Amphetamine disorder. She was instructed to complete an intensive outpatient program (IOP), attend 90 12-step meetings in 90 days, complete 12 steps with her sponsor, and follow up with her doctor at the Alexandria VA. J.C. moved into sober living, but only stayed two days before moving to the Discovery Inn Motel. J.C. relapsed on July 8, 2021, went back the VA hospital, and tested positive for Methamphetamines and Amphetamines on July 19, 2021.

With regards to housing, it is noted that J.C. signed a lease for a two-bedroom apartment but had not moved in. Regarding the domestic violence and

3

parenting classes, it was noted that J.C. had completed five of her six domestic violence classes but had missed her last two classes. She had been referred for Nurturing Parenting and was still awaiting a start date. Regarding mental health, J.C. was diagnosed with Bipolar Disorder, Deferred Mild PTSD, OCD, Anorexia, Traumatic Brain Injury, and Pathological Gambling. It was noted J.C. attends the VA hospital for her mental health and the agency worker has not been able to follow up with the VA counselor, but J.C. stated she attends all her appointments. It was also noted that J.C. had not made any parental contributions, but she does visit the child bi-weekly as scheduled, the visits go well, and J.C. always brings gifts for the child.

At the February 1, 2022 permanency and case review hearing, DCFS requested the plan goal change from reunification to adoption due to J.C.'s Structured Decision Making (SDM) level being High. The court changed the case plan goal to adoption.

J.C.'s progress was similar to the previous report with respect to her continued substance abuse, lack of stable housing, failure to make parental contributions and mental health treatment. At this point, J.C. had completed an additional 30-days inpatient at Longleaf Treatment Facility, was participating in outpatient programing through the VA, and was living at a sober living home in Alexandria. Children are not permitted to live in the home. J.C. was drug screened on October 8, and 25, 2021, and tested positive. She missed her drug screen on November 11, 2021. J.C. started parenting courses in September 2021 but was terminated from the course in December because she had not been compliant and later entered her treatment at Longleaf.

4

On July 22, 2022, DCFS filed a Petition for Termination of Parental Rights and Certification for Adoption. The petition alleged that the parents had abandoned the child under La.Ch.Code art. 1015(5), and there has been no substantial compliance with the case plan and there was no reasonable expectation of significant improvement in her condition or conduct in the near future under art. 1015(6).

A permanency hearing was held August 23, 2022, and J.C.'s progress was similar to the previous reports. J.C. had entered Longleaf for a second time due to a relapse. She had completed the program and gone to sober living, but only stayed briefly before moving in with her boyfriend. Because she is not on the boyfriend's lease, this does not classify as stable housing. She is however continuing her VA treatment for substance abuse and mental health. The report and case review also revealed that J.C. had completed the domestic violence and parenting classes. Following the goal change, visitation was changed to once per month, but J.C.'s visits continue to go well.

The termination trial was held September 12, 2022. The court terminated J.C.'s parental rights and certified Z.C. as freed for adoption finding J.C. had not substantially complied with her case plan. J.C. now appeals.

III.

**STANDARD OF REVIEW**

A judgment terminating parental rights is reviewed under the manifest error standard of review. *State in the Interest of M.J.F.*, 18-584 (La.App. 3 Cir. 12/6/18), 261 So.3d 879.

> A trial court's factual determinations as to whether there has been substantial compliance with a case plan, whether

5

a significant indication of reformation has been shown, and whether the parent is likely to reform will not be set aside unless the record reflects that the trial court is clearly wrong.

*State ex rel. G.O.*, 10-571, pp. 5-6 (La.App. 3 Cir. 6/8/11), 68 So.3d 636, 640, *writ denied*, 11-1512 (La. 7/21/11), 67 So.3d 479.

IV.

## LAW AND DISCUSSION

In *State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72, this court explained:

> A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id*. Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id*; La.Ch.Code art. 1037.

In their petition, DCFS asserted termination based on La.Ch.Code art. 1015(5)(b) and (6). Louisiana Children's Code Article 1015(5)(b) provides the following ground for termination of parental rights:

> Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

6

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

Louisiana Children's Code Article 1015(6) permits termination when:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) and (D) provides the grounds for lack of parental compliance with a case plan, stating:

C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1)    The parent's failure to attend court-approved scheduled visitations with the child.

(2)    The parent's failure to communicate with the child.

(3)    The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4)    The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5)    The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6)    The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7)    The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1)     Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2)     A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3)     Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In granting the termination, the trial court stated:

    Mr. James, I would agree with you that this isn't the typical case where somebody is not attempting to go to the treatment and do those things. The problem that I have in this case is the combination of the mental health and substance abuse. And I think that the cases clearly talk about too little too late when the Court is faced with a situation of multiple substance abuse attempts for treatment, none of them have been successful.

    I agree I do this all the time, and certainly there are times when seven times is not uncommon for someone to go to treatment. But for those people who do that, they go and there's some hope that the mental illness it's the

8

mental illness that's causing me to what we call self medicate, which is what the drugs do.

This child needs permanency, and I don't believe that [J.C.] has shown me that it is likely that she can complete all aspects of the case plan. She has not had housing. She has – the mental health is there and confirmed. And most importantly for me, she has failed to be able to get a handle on her substance abuse that I think would make her parenting unsafe.

And for those reasons, the Court would sign a judgment on presentation.

As to the father, the Court finds that the father has failed to do any of his case plan, and the Court would terminate his parental rights at this time.

In order to be compliant with her case plan, J.C. was required to maintain stable housing, maintain contact with the agency, address mental health issues, address substance abuse issues, make parental contributions, complete parenting classes and complete domestic violence classes. J.C. failed to maintain housing and make parental contributions. Although she brought gifts to the child during visits, she never once made the $100 contribution payment despite receiving over $4000 a month from the VA and SSI. Although she signed a lease in August of 2022 shortly before the trial, that home was never assessed, and the court reports submitted by DCFS state that J.C. understood she had to maintain housing for 6 months which she had yet to do.

Most importantly, the court found J.C. failed to get a handle on her substance abuse and mental health issues. The court noted that J.C. had been trying. However, despite multiple attempts at rehab, J.C. has been unable to maintain sobriety. She tested positive for drugs shortly before the termination trial and admitted she hadn't been taking her prescribed medication. The court also found that despite her continued treatment with the VA, J.C had ongoing mental health

issues that created her substance abuse problems. Based on her pattern of relapsing and failing to change the behavior that led to the child's removal in the first place, we find that the trial court was not manifestly erroneous in finding that DCFS proved by clear and convincing evidence that J.C. failed to comply with her case plan and was unlikely to improve in the near future.

Z.C. was in an adoptive placement and had been with the same family since her removal. She was doing well there and had formed bonds with the family. Z.C. had spent half her life with her foster family. Given her young age and the need for permanency, the trial also did not err in finding that termination was in the best interest of the child.

On appeal, J.C. also argues the trial court erred by finding that DCFS proved abandonment under La.Ch.Code art. 1015(5) by clear and convincing evidence. Although the trial court never mentions abandonment in its oral ruling, the written judgment states that DCFS had met its burden under La.Ch.Code art. 1015(5) and that J.C. had failed to make parental contributions for a period of six months. The article clearly states that failure to provide significant contributions for six consecutive months is a circumstance demonstrating an intention to permanently avoid parental responsibility. J.C.'s case plan included a monthly parental contribution of $100. It is undisputed that J.C. failed to make any parental contributions during the pendency of her case despite having significant income. Although the record reveals that she always brought gifts for the child to her visits, there is not any evidence of the substance or value of these gifts. Based on the record, we find no manifest error in the trial court's determination that these gifts did not amount to significant support.

V.

## **CONCLUSION**

For the foregoing reasons, the judgment of the trial court ordering the termination of parental rights to the minor child Z.C. is affirmed. All costs of this appeal are assessed against the appellant.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Rule 2-16.3 Uniform Rules, Court of Appeal.