# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

**25-676**


**STATE IN THE INTEREST OF**

**A.N.C.**



**\*\*\*\*\*\*\*\*\*\***

**APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NUMBER 2024-TP-11
HONORABLE LOREN M. LAMPERT, DISTRICT JUDGE**

**\*\*\*\*\*\*\*\*\*\***

**SHARON DARVILLE WILSON
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sharon Darville Wilson, Guy E. Bradberry and Wilbur L. Stiles, Judges.


**AFFIRMED.**

**Annette Roach**
**ROACH & ROACH, APLC**
**2720 Rue de Jardin, Suite 100**
**Lake Charles, Louisiana 70605**
**(337) 436-2900**
**COUNSEL FOR APPELLANTS:**
      **M.T.C., Sr. & J.N.C.**

**Ruby Norris Freeman**
**LOUISIANA DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**BUREAU OF GENERAL COUNSEL**
**900 Murray Street**
**Alexandria, Louisiana 71301**
**(318) 484-2178**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**WILSON, Judge.**

J.N.C. and M.T.C. appeal the judgment of the trial court terminating their parental rights to the minor child A.N.C. and certifying her for adoption.[1] For the reasons expressed below, we affirm the judgment of the trial court.

I.

## ISSUES

On appeal, J.N.C. and M.T.C. assert the following assignments of error:

(1)        The court manifestly erred by finding clear and convincing evidence was presented to establish that both J.N.C. or [M.T.C.] had not substantially complied with their case plans, that [the Department of Children and Family Services (DCFS)] provided reasonable efforts to assist both parents to complete their respective case plans, and that there was no reasonable expectation of a significant improvement by either parent in the near future.

(2)        The court manifestly erred by finding that the State proved by clear and convincing evidence that termination of the parental rights of either J.N.C. or [M.T.C.] was in the best interes[t] of A.N.C.

J.N.C. and M.T.C. also filed a motion to strike a portion of the exhibits submitted to the court to the extent that there are references to events that occurred after the July 31, 2025 hearing as well as documents filed after this date. DCFS filed an opposition to the motion. The motion to strike was referred to the merits of this appeal.

---

[1] The initials of the minor child and parents are used to preserve the anonymity in this confidential proceeding. See Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2.

## II.

## FACTS AND PROCEDURAL HISTORY

J.N.C. and M.T.C. are the biological parents of A.N.C., a girl born on May 16, 2023. Other children of J.N.C. and M.T.C. were in the care of DCFS at this time. On October 2, 2023, DCFS received a report that A.N.C. had been placed at risk of harm as a result of drug exposure through breastfeeding. DCFS was unable to assess the welfare of A.N.C. because the parents denied DCFS access to A.N.C. DCFS obtained an Instanter Order to bring A.N.C. into the State's custody. That order was signed on October 16, 2023. After coming into foster care, A.N.C. was placed in the home of the mother's brother. A.N.C. was adjudicated a child in need of care (CINC) and the adjudication order was signed on December 29, 2023.

A case plan dated March 20, 2024, was established by DCFS and approved by the court at the review hearing on April 18, 2024. The court concluded that DCFS had provided reasonable efforts toward reunification and continued custody of A.N.C. with DCFS. On May 1, 2024, A.N.C. was placed in a certified adoptive placement with fictive kin. A permanency hearing was held on October 17, 2024, during which the court accepted the case plan filed by DCFS on October 3, 2024, with a recommended goal of adoption. The court concluded that DCFS had made reasonable efforts and continued custody of A.N.C. with DCFS.

DCFS filed a Petition for Termination of Parental Rights and Certification for Adoption on June 20, 2024. A termination hearing was held, and the trial court heard the testimony of both parents and the DCFS case worker assigned to the case, Ikeia Johnson. The trial court granted DCFS's petition and M.T.C. and J.N.C.'s parental rights were terminated by judgment rendered on September 18, 2024. Both parents filed timely motions for appeal which were granted on October 7 and 8 of 2024.

On May 28, 2025, this court rendered an opinion in *State in Interest of A.N.C.*, 24-679 (La.App. 3 Cir. 5/28/25), 416 So.3d 728, which partially reversed the judgment due to a procedural error involving the record. This court was unable to discern whether the trial court examined the 2023 CINC record pertaining to A.N.C. or whether the trial court examined the 2022 CINC record pertaining to the biological siblings of A.N.C. As a result, this court reversed the judgment to the extent that parental rights were terminated and remanded for further proceedings.

The trial court held a pre-trial hearing on July 10, 2025, to ascertain what issues were before the court on remand. At the pre-trial hearing, it was noted that when the clerk was preparing the record for the 2024 appeal, the clerk entered an amended minute entry to correct the docket number on the exhibit that was admitted during the termination hearing, believing it to be an error. The remanded termination hearing was held July 31, 2025. The evidence admitted included this court's opinion rendered on May 28, 2025, the transcript of the original hearing, the 2022 CINC record, and the 2023 CINC record pertaining to both A.N.C. and her siblings. The trial court also took judicial notice of all testimony adduced at the original hearing. No new testimony was offered at the hearing. The trial court took the matter under advisement. On August 4, 2025, the trial court issued written reasons for judgment, and a final judgment terminating the parental rights of J.N.C. and M.T.C. and freeing A.N.C. for adoption was signed on August 29, 2025. J.N.C. and M.T.C. timely filed motions for appeal which were granted September 12, 2025. A motion to enroll appellate counsel was filed September 25, 2025, and granted September 26, 2025.

III.

## STANDARD OF REVIEW

A judgment terminating parental rights is reviewed under the manifest error standard of review. *State in the Interest of M.J.F.*, 18-584 (La.App. 3 Cir. 12/6/18), 261 So.3d 879.

> A trial court's factual determinations as to whether there has been substantial compliance with a case plan, whether a significant indication of reformation has been shown, and whether the parent is likely to reform will not be set aside unless the record reflects that the trial court is clearly wrong.

*State ex rel. G.O.*, 10-571, pp. 5–6 (La.App. 3 Cir. 6/8/11), 68 So.3d 636, 640, *writ denied*, 11-1512 (La. 7/21/11), 67 So.3d 479.

IV.

## LAW AND DISCUSSION

*Motion to Strike*

J.N.C. and M.T.C. seek to strike portions of the exhibits in the appellate record which occurred after the July 31, 2025 termination hearing. Louisiana Code of Civil Procedure Article 2164 provides that the appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. "The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, jury instructions, judgments and other rulings, unless otherwise designated. La.Code Civ.P. arts 2127 and 2128." *Frank v. Frank*, 06-1223, pp. 6–7 (La.App. 3 Cir. 2/7/07), 948 So.2d 1224, 1228. Our review on appeal "is limited strictly to the record as it existed at the time the underlying judgment was rendered." *Capital City Press, L.L.C. v. Louisiana State Univ. Sys. Bd. of Sup'rs*, 13-00, 13-01, p. 8 (La.App. 1 Cir. 12/30/14), 168 So.3d 727, 734, *writ denied*, 15-209 (La. 4/17/15), 168 So.3d 401.

4

Upon review, the record submitted to us does contain documents which were filed after the termination hearing and the judgment was signed. Because these documents were clearly not part of the record at the time the underlying judgment was signed, they cannot be considered part of "the record on appeal." As such, we grant the motion to strike the portions of the exhibits filed after the date of the judgment, and this court will not consider said portions on appeal.

*Substantial Compliance with Case Plan*

In their first assignment of error, J.N.C. and M.T.C. assert that the trial court erred by finding clear and convincing evidence was presented to establish that they had not substantially complied with their case plans and that there was no reasonable expectation of a significant improvement in the near future. They further allege that the trial court erred by finding that DCFS provided reasonable efforts to assist both parents to complete their case plans.

In *State in the Interest of J.A.*, 17-500, pp. 3–4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72, this court explained:

> A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id*. Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id*; La.Ch.Code art. 1037.

DCFS asserted termination based on La.Ch.Code art. 1015(5) which provides:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In determining a parent's lack of substantial compliance with a case plan,

La.Ch.Code art 1036 provides, in pertinent part:

C. In accordance with Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

D. In accordance with Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

A.N.C. was removed from her parents' custody on October 16, 2023, and the petition for involuntary termination was filed on June 20, 2024. Although A.N.C. had not been in custody for a period of at least one year, authority was granted by the court to proceed sooner because the court had terminated the parental rights of these same parents to four other children and non-compliance was a major component of the termination.

The DCFS caseworker, Ms. Johnson, testified that J.N.C. and M.T.C.'s case plans required them to obtain and maintain housing, obtain and maintain employment, complete visitation, maintain contact with the agency, pay parental contributions, complete substance abuse and mental health treatment, comply with random drug screens, and complete parenting classes.

As to the first element of the case plans, housing, Ms. Johnson testified that she was unable to assess the housing for the parents because the address which they had provided was a vacant home. This home had busted windows and holes in the floor, roof, and walls. It also had no running water or electricity. She further testified that on July 25, 2024, she found out that they were living in an apartment

7

behind the home, but they never responded to set an appointment to see it. At trial, J.N.C. testified that she was currently living with her eighteen-year-old daughter, and the daughter's boyfriend, in a two-bedroom apartment in Leesville until she could get into a house. She further testified that she told Ms. Johnson that she was in the process of finding a place but had not told her that she was living with her daughter. M.T.C. testified that he was currently living in an apartment with others in Pineville. Neither parent testified that they currently had stable housing of their own.

Regarding employment, both parents reported that they were self-employed and worked doing various odd jobs. Ms. Johnson testified that neither parent ever provided her with proof of income or employment. Both parents testified that they attempted to provide receipt books but were told it was not acceptable and they needed to provide bank statements or something similar. They also testified that J.N.C. dropped off copies of their taxes at Ms. Johnson's office, but Ms. Johnson did not receive them. They stated that the taxes were submitted in court, but J.N.C. testified that she was not sure if a copy was given to Ms. Johnson. Ms. Johnson testified that she never received the tax forms, but they would have been sufficient. Neither parent brought a copy of the taxes to the hearing.

All parties testified that the parents visited with A.N.C. and were in compliance with this aspect of the case plan.

Concerning contact with DCFS, Ms. Johnson testified that the parents did not maintain contact with the agency. She stated that they share a phone and they do not answer phone calls or return messages. J.N.C. testified that they made several attempts at contact since A.N.C. was removed from the care of her brother to find out where the baby was and how to contact her. She explained they have bad service and sometimes the messages didn't come through.

8

Regarding parental contributions, both parents and Ms. Johnson testified that neither parent had made any parental contributions throughout the case. Ms. Johnson testified that contributions would be dependent upon the parents' financial stability, but they had never provided proof of income. She stated that she and her supervisor eventually had a meeting with the parents, informing them to pay ten dollars for each month A.N.C. had been in care. The Parents told her they would bring a money order to her office, but this never occurred. J.N.C. testified that she was told to pay ten dollars a month a week before the hearing but had not done so. M.T.C. testified that he was not told an amount until two weeks before the hearing and he had not made any payments.

As to the mental health component, both parents completed mental health assessments with Caring Choices. Neither parent was recommended for treatment. DCFS accepted the assessments, and both parents were fully compliant with this component of the case plans.

As to the substance abuse component, Ms. Johnson testified that the parents failed to complete substance abuse treatment. She further testified that both parents were referred to Beacon Behavioral Health (Beacon) because of positive drug screens for amphetamines and methamphetamines in September 2023. Beacon reached out to them several times to no avail. The parents eventually made an appointment for March 5, 2024, but neither attended nor rescheduled. J.N.C. testified that she never completed substance abuse treatment because Caring Choices said she didn't qualify because she had only failed a hair follicle test. M.T.C. also testified that he went to Caring Choices and was told that he did not qualify for substance abuse treatment.

As to the random drug screens, Ms. Johnson testified that neither parent had completed any of the requested drug screens from the start of this case on October

16, 2023, to the date of the original trial on August 28, 2024. She specifically testified that there had been nineteen drug screen refusals by J.N.C. M.T.C. similarly refused to submit to random drug screens. The trial court ordered the parents to submit to drug screens on two occasions, and they again failed to comply. Regarding the court-ordered screens, both parents testified that on one occasion the provider ran out of testing supplies and on the other occasion they experienced car troubles. Ms. Johnson testified that refused drug screens are considered positive under DCFS policy.

In defense of her failure to submit to drug screens, J.N.C. stated that she had "lost faith really" after receiving a positive result in September 2023 despite having received a negative result from her parole officer on the same day. When asked, M.T.C. testified that he was out of town for several of the screens and had asked if he could take them in Vernon Parish but was told no. He further testified, "For that I have no excuse. . . . some of them we just didn't go because if you know you're not doing drugs and you take a drug screen and it comes back positive how do you, how do you take that? How do you handle that?" He then testified, "[W]hy give them more ammunition to shoot at us." When asked why he did not take action if he understood it was required, he stated, "Um, we did until we stopped complying with the drug testing. Up until then, we followed the case plan."

The final requirement was parenting classes. J.N.C. fully completed this portion of the case plan, but Ms. Johnson testified that M.T.C. did not complete this component. M.T.C. testified that he completed twelve of the sixteen required classes before he was arrested. After being released from jail, he was told that he had missed too many classes and had to start over. He testified that he asked Ms. Johnson to re-refer him for parenting classes and she told him he needed a second substance abuse evaluation. M.T.C. never completed a second evaluation because he claims that

10

Beacon wouldn't offer services if there were not mental health issues and he felt there was no point. M.T.C. never completed this component of the case plan.

In its written reasons for judgment, the trial court noted:

> The evidence adduced at trial revealed that despite repeated referrals both parents had failed to avail themselves of either the drug testing or treatment portion of their case plan. This is especially troubling as serious substance abuse has permeated this case from its inception. Of significant note is that the evidence suggests that the mother was breast feeding A.N.C., as an infant, while abusing serious controlled dangerous substances. Furthermore, substance abuse was a major factor which led to the termination of parental rights in the 2022 case.
>
> Moreover, the evidence clearly and convincingly established the failure to acquire adequate income or housing. Moreover, the evidence established failure to maintain regular and effective contact with the Agency. Although the mother attempted to explain, shift blame, and ultimately justify the noncompliance, this Court has significant concerns with her credibility.
>
> As to the likelihood of improvement in condition or conduct in the near future, this Court finds that such is unlikely. As explained earlier, A.N.C. would be the fifth child in which the parents' rights were terminated in two months in cases ongoing since October 2022. The parents' appearance in court, demeanor, testimony, and actions does nothing to indicate a significant positive change in trajectory in the near future[.]
>
> Accordingly, this Court finds that the State has established – by clear and convincing evidence – there has been no substantial parental compliance with the case plan and no reasonable expectation of improvement in the parents' condition or conduct in the near future, considering the child's age and her need for a safe, stable and permanent home.

J.N.C. and M.T.C. failed to complete several aspects of their respective case plans. Most notable was their failure to communicate with DCFS, failure to maintain stable housing, and complete refusal to submit to random drug screens. The refusal to comply with random drug screens is particularly damning given that A.N.C. was taken into custody due to possible drug exposure. Accordingly, we find that the trial court was not manifestly erroneous in finding that DCFS proved by clear and convincing evidence that J.N.C. and M.T.C. failed to comply with their case plans.

11

In ruling, the trial court specifically took issue with the parents' contact with DCFS. As to the parental contributions, the trial court noted,

[W]e create this futility cycle by saying I can't provide support for my kids because nobody will tell me what I owe for my kids. At the same time, I have an obligation to provide information to give them the capacity to calculate what I owe for my kids but by not providing that information, I give them the ability to say we'll [sic], you know, we don't know what you owe[.]

The trial court also noted there were significant problems with the credibility of both parents. The court explained, "It seemed to me every time there was a get to do something, DCFS could get in touch with you. Every time there was a got to do something, DCFS couldn't[.]" The trial court further pointed out the parents' history with DCFS and noted that it takes away their ability to say they didn't know what was required of them because this case was in addition to the case plan they had been working on for the other children. The trial court expressed that the refusal to submit to drug screens is "a complete disregard for the severity and the seriousness of what we're doing here." Given that J.N.C. and M.T.C.'s deficiencies in compliance resulted from their deliberate refusal to comply with aspects of the plan, despite knowing the gravity of the situation, the trial court did not manifestly err in finding that there was no reasonable expectation of compliance in the near future.

We also find that the trial court did not err in finding that DCFS provided reasonable efforts to assist both parents to complete their case plans. Louisiana Children's Code Article 603(26) defines reasonable efforts as "the exercise of ordinary diligence and care by the department . . . to provide services and supports designed and intended to prevent or eliminate the need for removing a child from the child's home, to reunite families after separation, and to achieve safe permanency for children." Ms. Johnson testified as to her repeated efforts to reach out to J.N.C. and M.T.C. and direct them to the appropriate programs to achieve reunification.

However, their failure to maintain contact with the agency, keep them apprised of their address, submit financial documents, and submit to drug screening was an impediment to reunification which frustrated DCFS's efforts.

*Best Interest of the Child*

In their final assignment of error, J.N.C. and M.T.C. assert that the trial court manifestly erred by finding that the State proved by clear and convincing evidence that termination of their parental rights was in the best interest of the child. A.N.C. was two years old at the time of the trial on remand. She has been in state custody since she was five months old and has been in an adoptive placement with fictive kin since May 1, 2024. Ms. Johnson testified that in the current placement she is safeguarded against all forms of abuse, especially drugs. A.N.C. is doing well in this placement and she is bonded with them. The current foster parents would also babysit A.N.C. when she was placed with J.N.C.'s brother, so she formed a bond with them before being placed with them. The trial court acknowledged that "these parents have sincere love for their child. However, love, successful visits and indications of a bond are not enough." The trial court held that "A.N.C. is in her tender years and is entitled to enjoy a safe, stable and permanent home without further delay[.]" Given her young age and the need for permanency, the trial court also did not err in finding that termination was in the best interest of the child and certifying her as eligible for adoption.

V.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellants, J.N.C. and M.T.C.

**AFFIRMED.**

13